**Bonnie TALADA, Plaintiff,**

v.

**INTERNATIONAL SERVICE SYSTEM, INC., and Ed Rice, Defendants.**

**Roberta INGRAHAM, Plaintiff,**

v.

**INTERNATIONAL SERVICE SYSTEM, INC., and Ed Rice, Defendants.**

No. 93–CV–734.

United States District Court,
N.D. New York.

Oct. 10, 1995.

Friedlander & Friedlander, P.C. (Betty D. Friedlander, William S. Friedlander, of counsel), Ithaca, New York, for Plaintiffs.

Coupe, Siegel, Hester, Stephens Kahler & Manion (Norman I. Siegel, of counsel), Utica, New York, for Defendant ISS.

Capecelatro, Del Buono & Compson, P.C. (Carl Del Buono, of counsel), Utica, New York, for Defendant Ed Rice.

### MEMORANDUM—DECISION and ORDER

HURD, United States Magistrate Judge.

## I. INTRODUCTION.

On January 9 through January 13, 1995, a non-jury trial was conducted in Utica, New York, for discrimination claims arising from the employment of the two named plaintiffs. Supplemental state law claims were dismissed in pretrial motions, and the federal Title VII claims were discontinued by stipulation against defendants Henry McIntyre and Joseph Kohler in the lead case, and against defendants McIntyre, Kohler and Wayne Askew in its companion, leaving only the federal Title VII claims against defendants International Service Systems, Inc., and Ed Rice in both cases. By agreement of the parties, post trial proposed findings of fact and conclusions of law were filed with the court on May 3, 1995.

The Civil Rights Act of 1991 amended the 1964 Act to offer trial by jury on Title VII claims. However, the 1991 Act carries no retroactive capacity to give plaintiffs Bonnie Talada and Roberta Ingraham a right to a jury on their Title VII claims. *Rivers v. Roadway Express, Inc.,* —— U.S. ——, 114 S.Ct. 1510, 128 L.Ed.2d 274 (1994); *Landgraf v. USI Film Prod.,* —— U.S. ——, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994). Therefore, this Court must decide plaintiffs' Title VII claims. The Court has heard and reviewed all of the evidence, including the testimony and exhibits and the arguments of counsel in the five day trial. The following decision constitutes this Court's findings of fact and conclusions of law, pursuant to Fed.R.Civ.P. 52, of plaintiffs' Title VII claims.

## II. *FINDINGS OF FACT.*

### A. *The Parties:*

1. Plaintiff Bonnie Talada ("Talada") worked as a janitor for defendant International Service System, Inc. ("ISS") who in turn contracted with IBM for the upkeep of the IBM Owego facilities. She started working at the Owego office complex on November 4, 1986, working third shift from 10:30 p.m. to 6:45 a.m., five days a week. She carried third shift through April 1, 1990, during the time when the incidents in question arose.

2. Plaintiff Roberta Ingraham ("Ingraham") began working for ISS the year ISS acquired the contract for service of the IBM complex in Owego. Prior to that time she had worked directly for IBM as janitorial staff at the Owego complex since 1976. She typically worked second shift from 6:00 p.m. to 2:30 a.m., and Ed Rice acted as her immediate supervisor.

3. Defendant ISS is a New York Corporation engaged in providing janitorial and cleaning services to among others, an industrial clientele. They have held the contract to service the IBM complex located in Owego, New York for over ten years.

4. Defendant Ed Rice ("Rice") held the Director of Operations position for ISS at the IBM Owego complex from 1989 until April 18, 1990. He had been friends with both Bonnie Talada and her husband Hillmont since 1976, having lived in the same vicinity, and having seen them on a social level. Hillmont Talada aided Rice in obtaining his position with ISS.

### B. *Incidents of Sexual Harassment:*

#### INCIDENT 1—(Ingraham):

In December 1989, Ingraham, working the 6:00 p.m. to 2:30 a.m. second shift, traversed her cleaning run which took her through Building 201 of the Owego complex. She entered 201's library and began collecting trash from its various disbursed receptacles. As she circulated through the library, Rice entered. He approached her directly, walked right up close to her, and immediately attempted to put his arms around her. He began touching her, placing one hand on her buttock. He made several comments to Ingraham, claiming "I've been waiting a long time for this," and telling her she had a "nice ass," attempting at one point to kiss her. She immediately pushed him away, stating, "Get the hell away from me." She left the library and went directly to the cafeteria where she found Brian Short ("Short") and Alexa Wales, fellow janitors, talking. Ingraham finished the day's work at Short's side, and only after leaving for the day, did she confide in him exactly what had transpired.

#### INCIDENT 2—(Ingraham):

Upon return to work in January 1990, after a Christmas vacation, snow had called most of the male workers out of building 201 to shovel and salt the traffic areas around the building. Ingraham remained inside alone to clean. Rice approached her and informed her that he had an area in need of cleaning. He led her to the administrative office area which was composed of two floors of offices. Ingraham did not suspect anything at this point, since Rice was her supervisor who possessed authority to assign cleaning tasks, and the administrative offices could very well have needed some form of attention. The elevator opened to the penthouse area, however—a third floor storage area off limits to cleaning personnel—and upon stepping out, Ingraham became very upset. Rice stated, "I have something hard and nice for you." He reached for her, telling her he could make her job easier with more days off. He attempted to kiss her at which point she told him to get away from her. She pushed the elevator button and fled to the ladies restroom on the first floor where she remained for some time.

#### INCIDENT 3—(Talada):

On March 21, 1990, some time after midnight during the third shift, Rice came to Talada at Building 002 of the Owego complex. He showed her a work order—referred to as a P.M. card; it required her to perform a certain task outside her normal routine—and escorted her to Building 102 of the complex, ostensibly to show her the work that needed completion.

Rice took her to an isolated telephone room containing columns of telephone wires and grids, bound by wooden frames standing approximately a foot apart up against the wall. Once inside the telephone room, he approached her and pressed her between the columns of wires, stating, "I have waited thirteen years for this." He took her hand and put it against his penis, stating he had something "nice and hard" for her and that if she cooperated, he could arrange a deception allowing her shorter work hours while still receiving full wages. He attempted to unfasten her pants, succeeding in unbuttoning them, but failing to unzip them. He continually handled her, putting his hands on her breasts and buttocks. This behavior continued for approximately fifteen to twenty minutes. He attempted to kiss her while she struggled with him. He forced his tongue into her mouth. At this point she bit his tongue, and forced her knee into his groin which enabled her to break free from her flanked and cornered position. Once free, she walked out of the room.

Distraught, emotional and crying, she walked quickly and methodically back to her work station, there encountering Michael Sherwood ("Sherwood"), a co-worker and union steward. She attempted to quickly recount the incident, when Rice strode up behind her and ordered her back to work. Talada did not report this occurrence, nor did Sherwood document their conversation.

The following night, Rice offered Talada a lighter work shift entailing the cleaning and straightening of cafeteria chairs—a reduction never offered her before.

---

A third woman, Marsha Armstrong ("Armstrong"), a temporary employee in 1988, had completed forty-three days of a forty-five day trial period required for union membership. She testified about a similar experience in dealing with Rice. She similarly repelled physical attempts at sexual contact, and refused quid pro quo offers of aid in attaining her forty-five day trial period. Armstrong however is not a party to this case.

### C. Reactions:

Talada and Ingraham had begun sharing their ordeals with each other in late March 1990. They began discussing what steps, if any, could be taken. Short urged the filing of grievances with the union. but both feared retaliation and reprisals for any action taken. Sherwood informally approached Henry McIntyre ("McIntyre"), ISS Facility Manager of IBM Owego, and explained the Talada incident on the night immediately following its occurrence on March 21, 1990 (Incident 3). McIntyre stated that the matter would be investigated. McIntyre notified Wayne Askew ("Askew"), his immediate supervisor, of the incidents reported to him. Askew directed McIntyre to conduct an investigation. McIntyre testified, "[He] told me to get with Jeff Soule who is the union steward, and have him put some discreet feelers out. This was all to be handled on a low-key basis." Askew testified, "As soon as the grievance was filed, I had instructed [McIntyre] that we had to insure that there was no contact at work between them, to make sure that their work areas did not overlap in any way." He also stated that he would personally handle interviewing Rice.

Rice was immediately removed to another station and another shift to avoid contact. On April 1, 1990, Rice was moved to third shift and Talada was placed on second.[1] An escort was assigned to him whenever he needed to enter the building where Talada and Ingraham worked.[2]

On April 9, 1990, Rice found Talada and Ingraham along with other ISS employees in the IBM cafeteria one-half hour early for their scheduled break.[3] Rice immediately

---

1. However, Ingraham testified to still seeing Rice in the building on several occasions. He still managed to enter the building without supervision.

2. Interestingly, Armstrong, the third of the three woman known to have had problems with Rice, was promoted to supervisor for the very purpose of providing a female escort for Rice.

3. Although Rice's presence on the second shift only eight days after his transfer to third shift may spur questions, Rice testified that third shift overlapped with second shift, and that third shift was eliminated shortly after his transfer, whereupon he was moved back to second shift, where plaintiffs worked.

filed warnings against each employee for illegal breaks. At this time, none of the three women had filed charges of any kind against Rice.

On April 17, 1990, Talada and Ingraham, accompanied by union steward Sherwood, met with McIntyre and Ed West ("West"), the second shift manager, and discussed options. Talada and Ingraham sought Rice's dismissal. However, McIntyre agreed to less severe steps—removal of Rice from direct contact with the two by reassigning him to another building. According to Talada, McIntyre informed them that an investigation had turned up no evidence of any sexual harassment. Of course, the placement of Rice on another shift had already taken place. The next day, on April 18, 1990, Talada and Ingraham filed grievances charging Rice with sexual harassment.

McIntyre filed a report with Askew on July 13, 1990—having spoken with six separate janitors—explaining that none of the interviewees knew of the incidents. Rice was interviewed and a written statement was taken from him. Neither Talada nor Ingraham were interviewed, allegedly due to the pending union grievances.

Talada and Ingraham filed charges with the EEOC in 1991. It was not until that time that Rice was removed from the IBM complex.

Other supervisors working along with Rice and Armstrong, included West, Joe Kohler ("Kohler"), and Gene Hines. The supervisors would regularly congregate in the supervisor's office prior to going out on the floor. Rice and McIntyre were present less often. It was in this office that much of the animosity presented itself. Armstrong spent the majority of her work time accompanying Kohler, about half of which was spent in the building where Talada and Ingraham worked. Kohler often made comments to the other supervisors, such as: "[L]et's go and see if we can find what that bitch is doing tonight," referring to Talada. He regularly referred to the plaintiffs as bitches. Many of the comments sounded in front of McIntyre without rebuke, instilling a tacit support for the views. At one point Kohler stated, "[L]ets go out and see if we can get these bitches," and Rice followed stating, "I'm going along with you." McIntyre commanded Rice to sit back down, stating that he was in enough trouble, but left Kohler to his actions.

After the grievances were filed, the animosity began to display itself more directly. In June 1990, Ingraham having been given a new task of supplying restrooms with trash bags for sanitary napkins, sought direction on what to do with them from Kohler. He replied, "I don't care if you shove them up your ass."

Talada was forced to perform work over and above her normal cleaning routine. She was ordered to change electrical fuses in the ceiling, clean drains (testimony characterized this as one of the least desirable tasks), and to clean ceiling tiles.

Ingraham likewise felt increased pressures. Both felt subjected to relentless supervision. Ingraham testified, "There was several supervisors. They used to hide in offices and jump out of stairways and always lurking around.... I remember seeing Joe Kohler, Ed West. Marsha [Armstrong] used to be with Joe. Those basically were the main ones."

On September 24, 1990, Ingraham stopped at a bowling alley prior to work and noticed Askew following her. From there he followed her to the parking lot of the Owego plant and noted where she parked. Although she had parked in this area for her entire tenure at the complex, she was instructed to move her car, and was warned of reprimand and possible termination if she were to park in an unauthorized spot again.

Between April 20, 1990, and August 9, 1990, Talada filed eight separate grievances against ISS management. The first involved harassment by Kohler. In the second, she claimed that she was forced to use hazardous equipment in the form of a carpet machine with bare electrical wires, while supervisors Kohler and Hines watched without concern. The third involved a dispute about holiday pay. The fourth alleged that the grievance procedure was being circumvented. The fifth claimed that she was sent home with a bloody nose and not permitted to return to work without medical authorization. When

informed that she could not get a doctor's appointment for several days, Kohler refused her request to return and to obtain the authorization subsequent to her return. Her sixth grievance alleged a failure to allow senior janitors a choice of work details as provided by union agreement. Her seventh grievance again claimed harassment and threatening behavior by Kohler which this time included Armstrong. Finally she grieved that Kohler and Armstrong assigned work details unduly hard in retaliation for her grievance and mediation attempts on other matters, and threatened to write her up for insubordination if the work details were refused.

Talada was issued several written warnings during that time. The first was issued on May 9, 1990, for failing to sign a log book referred to as a T & M book, and disobeying a direct order to do so. On June 8, 1990, another written warning was issued for accumulating more than twenty-four hours of unexcused absence between April 18, and June 8, 1990. On June 11, 1990, Talada was again issued a written warning, this time for being outside her work area. Defendants argue that plaintiffs' perceptions of increases in pressure were mistaken, pointing out that Talada's record reflects no increase in discipline, since she received six written warnings during the year 1988 and was out on disability for the year 1989.

On August 8, 1990, an incident arose that effectively brought the increasingly inflammatory relationship to a boil. Armstrong remembered Kohler starting off the shift stating, "[L]ets get the fucking bitch." Talada was working the cafeteria at that time. She helped herself to popcorn left on the counter, and seasoned it with some garlic salt which was also displayed on the counter. Janitors and supervisors alike partook in the available snacks.[4] Although a janitor's closet was located in the cafeteria, portions of the cafeteria were considered off limits. Kohler came upon Talada vacuuming in the cafeteria, and immediately called in Armstrong. He reported that Talada had taken popcorn

and should be reported. He directed her to report to McIntyre's office where he recommended suspension pending investigation. She was written up for entering an unauthorized area of the complex, and for taking I.B.M. property (the garlic salt, not the popcorn). IBM personnel were notified along with Askew. Her access badge was pulled and she was escorted from the building while Rice and Kohler watched and made comments such as "We got her," and "One down, two to go"; the two allegedly referring to Ingraham and Short. Askew directed McIntyre to undertake an immediate investigation. Four statements were taken from managers.

Approximately one to two months after Talada was suspended, Askew and McIntyre met with the union to discuss various issues, among them, Talada's suspension. The union demanded to know when she would return to work. Askew stated that the investigation was ongoing and no decision could yet be made. The union felt that it was unfair to leave Talada "hanging out there," and demanded that some form of action be taken. Askew again refused. The union persisted. Askew refused three or four times before finally responding, "I have no alternative but to go for termination."

On February 13, 1991, at around 5:30 p.m. West reported to McIntyre that two of the janitors from building 201 were allegedly coming to work and were eating dinner on company time. West reported that he sent two supervisors, Kohler and Armstrong, to address the problem but instructed them not to issue reprimands.

Kohler and Armstrong followed West's order and reported to Building 201 to address the problem. Ingraham and Short were the focus of their attention. They reported seeing Ingraham warming food in the microwave oven at around ten minutes of six. Both reported waiting for approximately ten to twenty minutes before walking to the B floor of building 201. Both reported sensing a strong smell of food and following the smell to the janitor's room on that floor. Kohler

---

4. Kohler testified that he had partaken of the popcorn himself, and that supervisor Gene Hines had taken some popcorn that very night. Rice also testified to helping himself to handfuls of popcorn on occasion.

claimed that a grocery bag left wide open in the room contained the same plastic dishes that he had seen Ingraham place in the microwave earlier.

Ingraham's run started at 5:30. She punched in to work on time and reported to her assigned area for work. After finishing two conference rooms she returned to the janitor's closet. Upon returning, she found Armstrong standing at the door while Kohler examined her personal belongings—the contents of her lunch bag and purse. She immediately left to phone McIntyre's office, and told him she needed him to come to Building 201. He said he couldn't come at that time because of a scheduled meeting, but said he would send Rice or West. Ingraham asked that Rice not be sent. McIntyre apologized and said West would come.

At 6:15, Kohler and Armstrong reported finding Ingraham and Short at the vending area and asked them if they were planning to eat dinner. Kohler informed them of the time, their failure to fill any trash carts since punching in at 5:30, and that reprimands would be forthcoming. Ingraham allegedly responded by raising her middle finger in a gesture toward Kohler and said, "Right here, Kohler." As Armstrong and Kohler left, Ingraham stated that they had no right to go through her belongings. Kohler responded that all he did was peer in a grocery bag. Ingraham and Short were then told to go back to work.

After the incident, Ingraham returned to cleaning drinking fountains on the third floor, and a short time later West and Askew appeared off the elevator. Askew asked what Ingraham was doing out of her area. She explained that she was supposed to be there. He said she was not supposed to be there, and ordered her, "To leave this floor and get down into your area now." Brian Short appeared and Ingraham requested that he stay with her. Askew ordered him back to work. He refused, stating that as union representative, he couldn't leave once requested to stay until she left. Askew and West left, and Ingraham attempted to finish the final fountain on the third floor. Moments later she caught Askew and West sneaking up the stairwell near the fountain. She exclaimed

that her nerves couldn't bear this abuse and asked to leave. West commanded her to go punch out.

Short left with her and they went to the bowling alley to talk. A short time later, Askew and McIntyre walked in and sat down without approaching them. Ingraham called Jerry Dennis, the union president, at his home and left a message. He returned her call at the bowling alley, and upon hearing Ingraham's synopsis of events, asked to speak with Askew. He refused the call however, claiming to be on his own time.

Ingraham took a personal day off the next day, still suffering from the incident, and returned to work the following day. She found her time card, as well as Short's time card, to have been removed. She was called into the office and informed that she had been terminated.

### III. CONCLUSIONS OF LAW.

Plaintiffs have alleged three separate claims under Title VII of the Civil Rights Act against each defendant: (1) quid pro quo sexual harassment; (2) sexual harassment in creating a hostile work environment; and (3) retaliation for undertaking a protected activity. Each will be dealt with in turn. Furthermore, since each plaintiff has alleged all three claims against each defendant, this court will endeavor to first discuss the law, and then discuss the facts relating to each plaintiff as against each defendant.

#### A. *Quid Pro Quo.*

██ "Quid pro quo harassment occurs when 'submission to or rejection of [unwelcome sexual] conduct by an individual is used as the basis for employment decisions affecting such individual.'" *Karibian v. Columbia University*, 14 F.3d 773, 777 (2d Cir.), *cert. denied*, —— U.S. ——, 114 S.Ct. 2693, 129 L.Ed.2d 824 (1994) (quoting 29 C.F.R. § 1604.11(a)(2) (1993) (Guidelines established by the Equal Employment Opportunity Commission)).

The gravamen of a quid pro quo claim is that a tangible job benefit or privilege is conditioned on an employee's submission to sexual blackmail and that adverse conse-

quences follow from the employee's refusal. Unlike in hostile environment cases, in quid pro quo cases the harassing employee acts as and for the company, holding out the employer's benefits as an inducement to the employee for sexual favors. Accordingly, in a quid pro quo sexual harassment case the employer is held strictly liable for its employee's unlawful acts.

*Carrero v. New York City Housing Auth.,* 890 F.2d 569, 579 (2d Cir.1989); *see also Karibian,* 14 F.3d at 777 ("[T]he law imposes strict liability on the employer for quid pro quo harassment.").

■ "The relevant inquiry in a quid pro quo case is whether the supervisor has linked tangible job benefits to the acceptance or rejection of sexual advances. It is enough to show that the supervisor used the employee's acceptance or rejection of his advances as the basis for a decision affecting the compensation, terms, conditions or privileges of the employee's job." *Karibian,* 14 F.3d at 778.

■ The facts of *Carrero,* supra, present a classic quid pro quo scenario. Plaintiff, Maria Carrero worked for the New York City Housing Authority, and after four years was promoted to Assistant Superintendent for a probationary term. She answered directly to Acting Superintendent, Miguel Peterson. Carrero looked to Peterson for all training of practices and procedures she needed to learn her job, and Peterson in turn evaluated her performance. Peterson however, reached beyond the professional relationship, at first by flirting; then by touching Carrero's knee or arm; later by attempting to kiss her. Carrero, from the first contact, informed a co-worker and asked advice. The advice was to confront Peterson. She did this to no avail. Her repeated resistance did not inhibit Peterson's efforts; rather, his efforts increased. At one point, after she evaded an attempted kiss, he informed her that he planned to fail her on her probationary report. At another incident, he publicly rebuked and embarrassed her. The Second Circuit determined that plaintiff had suffered from a clear case of quid pro quo sexual harassment.

Talada suffered from an assault similar to that of Carrero, on March 21, 1990. Under the pretext of a work order, Rice, her immediate supervisor, commanded her to report to a secluded telephone room where she was propositioned, cornered, physically handled, and offered work related benefit in return for consent. He proffered, "That if I went along with him if I didn't want to work, he would punch me in and out and pay me for eight hours work." He attempted to kiss her, fondle her and grab her. He kept her cornered against a rack of telephone wires. He attempted to undress her.

Ingraham found herself the victim of such predatory action on two separate occasions. The incident in late 1989, where Ingraham was approached by Rice in the library of building 201, subjected her directly to sexual harassment. Rice, her immediate supervisor, found her alone and began to accost her with sexually oriented remarks like, "Nice ass," and "I've been waiting for this for a long time." He physically handled her with sexually suggestive touching, grabbing, and attempted kissing. Ingraham escaped by abandoning her work route. She was emotional and upset, and retreated to another part of the building to find a friend to confide in.

The second incident likewise smacks of quid pro quo harassment. In January 1990, Ingraham was cleaning alone in building 201 while the majority of the janitorial staff worked out of doors clearing snow and ice. Rice brought her to a storage area under false pretenses of requiring a cleaning task in another portion of the building. Once alone in the storage area, he attempted to sexually contact her and to kiss her. He made the statement that he could make her job easier and she could have more days off. Distraught and upset, she fled by elevator to another floor and into the ladies room.

Rice's position as both Talada's and Ingraham's immediate supervisor, placed them in the very position guarded against by the foundations of the Civil Rights Act of 1964 and the Civil Rights Act of 1991 (the latter not applicable in this case; *see Land-*

*graf,* —— U.S. ——, 114 S.Ct. 1483.) [5] The actual assault, although of serious concern and severe in the damage caused, is only an ancillary focus of this claim.[6] The use of this supervisory power to effectually blackmail an employee into acting in a manner in which she otherwise would not, has been loathed from long before the enactment of these two Civil Rights Acts. It is the empowerment from the 1964 Act, however, that enables us to at least enforce some recompense from such abhorrent behavior. Both Talada and Ingraham stood to lose their livelihood by responding with the otherwise normal reaction of resistance; resistance in the form of complaints; resistance in the form of refusal. In fact, both Talada and Ingraham did resist in both forms. The eventual result—termination.

Physical resistance in the telephone room, defensive in nature and effective at removing Talada from the threatening situation she found herself in, only succeeded in blunting the immediate physical accosting. The employment relationship from that point had metamorphosized. Rice, having improperly used his supervisory power to his advantage and being rebuffed, would not now hesitate to use that power to punish Talada for her failure to cooperate and her infliction of perceived embarrassment upon him.

Lack of consent or cooperation, and eventual grievances by Ingraham led to increased antagonism and friction decaying the work environment and employer-employee relationship; the eventual result—her termination.

### B. Hostile Work Environment.

■ The Supreme Court described a hostile work environment as a workplace "permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment.'" *Harris v. Forklift Sys., Inc.,* —— U.S. ——, ——, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993) (quoting *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 65, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (1986)). "Isolated remarks or occasional episodes of harassment will not merit relief under Title VII; in order to be actionable, the incidents of harassment must occur in concert or with regularity that can reasonably be termed pervasive." *Tomka v. The Seiler Corp.,* 66 F.3d 1295, 1305 n. 5 (2d Cir.1995).

■ "Hostile environment and quid pro quo harassment causes of action are not always clearly distinct and separate. The discrimination which gives rise to them is not

5. *Alexander v. Gardner–Denver Co.,* 415 U.S. 36, 44, 94 S.Ct. 1011, 1017, 39 L.Ed.2d 147 (1974) ("Congress enacted Title VII of the Civil Rights Act of 1964 to assure equality of employment opportunities by eliminating those practices and devices that discriminate on the basis of race, color, religion, sex, or national origin." (citations omitted)); *Griggs v. Duke Power Co.,* 401 U.S. 424, 429–431, 91 S.Ct. 849, 852–854, 28 L.Ed.2d 158 (1971) ("The objective of Congress in the enactment of Title VII is plain from the language of the statute. It was to achieve equality of employment opportunities and remove barriers that have operated in the past to favor an identifiable group of white [or male etc.] employees over other employees.... Congress did not intend by Title VII, however, to guarantee a job to every person regardless of qualifications. In short, the Act does not command that any person be hired simply because he was formerly the subject of discrimination, or because he is a member of a minority group. Discriminatory preference for any group, minority or majority, is precisely and only what Congress has proscribed. What is required by Congress is the removal of artificial, arbitrary, and unnecessary barriers to employment when the barriers operate invidious-

ly to discriminate on the basis of racial or other impermissible classification."); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 801, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973) ("The broad, overriding interest, shared by employer, employee, and consumer, is efficient and trustworthy workmanship assured through fair and racially neutral employment and personnel decisions. In the implementation of such decisions, it is abundantly clear that Title VII tolerates no racial discrimination, subtle or otherwise.")

6. *Carrero,* 890 F.2d at 579 ("The gravamen of a quid pro quo claim is that a tangible job benefit or privilege is conditioned on an employee's submission to sexual blackmail and that adverse consequences follow from the employee's refusal."); *see also Alexander,* 415 U.S. at 48–49, 94 S.Ct. at 1020 ("[T]he legislative history of Title VII manifests a congressional intent to allow an individual to pursue independently his rights under both Title VII and other applicable state and federal statutes.... Title VII was designed to supplement, rather than supplant, existing laws and institutions relating to employment discrimination.")

neatly compartmentalized, but as [the *Carrero* ] case demonstrates, the two types of claims may be complementary to one another." *Carrero,* 890 F.2d at 579.

 On the one hand, quid pro quo discrimination assesses strict liability upon the employer once an actionable sex discrimination is shown. "In contrast, a 'hostile work environment' theory requires that the plaintiff prove not only actionable sex discrimination, but also that the supervisor's actions should be imputed to the employer." *Kotcher v. Rosa and Sullivan Appliance Ctr., Inc.,* 957 F.2d 59, 62 (2d Cir.1992).

 To prove an actionable hostile work environment claim then, this two step process of first showing discrimination, and then imputing a supervisor's actions to the employer must be pursued. With regard to the first prong of this test, the Second Circuit has explained that a review of the totality of the circumstances determines discrimination's existence. *See Snell v. Suffolk County,* 782 F.2d 1094, 1103 (2d Cir.1986). They point to a number of elements, including:

1. Whether the "harassment occurred with respect to 'terms, conditions, or privileges' of employment, 42 U.S.C. § 2000e–2(a)(1), though she need not show that she lost any tangible job benefits as a result thereof;" *Kotcher,* 957 F.2d at 62;

2. Offensiveness, pervasiveness, and continuous nature of the defendant's conduct; *Carrero,* 890 F.2d at 577; *Kotcher,* 957 F.2d at 62 ("The harassment at issue must be 'sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment;' [*Vinson,* 477 U.S. at 67, 106 S.Ct. at 2405]");

3. Repetition and continuousness of incidents; *Kotcher,* 957 F.2d at 62 ("isolated acts or occasional episodes will not merit relief"); *see also Carrero,* 890 F.2d at 577;

4. Conduct must be unwelcome; *Vinson,* 477 U.S. at 68, 106 S.Ct. at 2406.

 These elements, once established, combine to show an abusive work environment. To prove the other factor—that the conduct should be imputed to the employer—the plaintiff's burden was only recently clarified. In order to impute the offensive conduct to the employer, the employer must have "provided no reasonable avenue for complaint or knew of the harassment but did nothing about it." *Kotcher,* 957 F.2d at 63; *See also Snell,* 782 F.2d at 1104.[7] Yet, "[L]ack of notice and the existence of complaint procedures do not automatically insulate an employer from liability." *Karibian,* 14 F.3d at 779. "At some point ... the actions of a supervisor at a sufficiently high level in the hierarchy would necessarily be imputed to the company." *Kotcher,* 957 F.2d at 64. A harasser's supervisory status over the harassed increases the likelihood of employer liability. *Id.* The Second Circuit explained only weeks ago:

> [I]f a plaintiff's supervisor is the alleged harasser, an employer will be liable if the supervisor uses 'his actual or apparent authority to further the harassment, or if the supervisor was otherwise aided in accomplishing the harassment by the existence of the agency relationship.' *Karibian,* 14 F.3d at 780. By contrast, where a low-level supervisor does not rely on his supervisory authority to carry out the harassment, or a co-employee of the plaintiff is the alleged harasser, an employer will generally not be liable unless [the two part *Kotcher* test is satisfied]. *Kotcher,* 957 F.2d at 63.

*Tomka,* 66 F.3d at 1305.

 Thus, "an employer is liable for the discriminatorily abusive work environment created by a supervisor if the supervisor uses his actual or apparent authority to further the harassment, or if he was otherwise aided in accomplishing the harassment by the exis-

---

7. Beyond the guidance of the Second Circuit, the Supreme Court has directed that courts should look to basic agency principles in determining liability of the employer. *See Vinson,* 477 U.S. at 67, 106 S.Ct. at 2405.

tence of the agency relationship." *Karibian,* 14 F.3d at 780.[8]

"It would be a jarring anomaly to hold that conduct which always renders an employer liable under a *quid pro quo* theory does not result in liability to the employer when that same conduct becomes so severe and pervasive as to create a discriminatorily abusive work environment." *Id.* at 781.

■ The case of *Tomka,* supra, presents a striking parallel to the facts and circumstances of the case at bar. The defendant employer, The Seiler Corporation, offered cleaning services out of its "Environmental Service Division." Similar to ISS's organizational structure, Seiler employed both on-site managers and district managers in a hierarchical scheme to supervise the services rendered. A series of comments, jokes, innuendos, and assaults directed at plaintiff over the course of her tenure combined to aid in her withstanding summary judgment. The court noted that "[t]he trier of fact should consider the comments about Tomka's body, innuendos about her sex life, and other lewd remarks, together with the assaults, on the issue of abusive working environment." *Tomka,* 66 F.3d at 1305 n. 5.

■ Both Ingraham and Talada possess actionable discrimination claims, and thus satisfy the first prong of the *Kotcher* test. Each was subjected to unwanted sexual language and physical contact by an immediate supervisor. Each was offered benefit in some form for her consent or cooperation. Each resisted and complained. Each suffered a virtual counterattack by supervisory personnel, and eventual termination.

Subsequent to their resistance to the harassment, both Talada and Ingraham began to receive degraded treatment. Supervisors, Kohler in particular, referred to them as "bitches," and singled them out for severe retaliatory treatment. Reaction from Rice—obvious: a quick jump and a comment, "I'm going along with you." Reaction from McIn-

tyre—none, for Kohler's comment; only minor against Rice's enthusiasm, stating his concern that Rice was in enough trouble. Implicit support of the attitude by management fostered and furthered it.

Ingraham found herself spied upon by management and supervisors alike, both on and off the job. She found supervisors intruding upon her privacy by searching her belongings while she worked. Management's response to such an occurrence was to demand to know why she was out of her assigned work area.

Talada received reprimands, warnings, and reports from supervisors accusing her of minor infractions, such as signing a log book known as a T & M book, being out of an assigned area, or "stealing" a shake of garlic salt. These incidents show not a troublesome employee as apparently intended, but an increased inflexibility on the part of supervisors and management with an increasingly adversary relationship which spiraled into her inevitable suspension and termination. Discipline drew smiles from supervisors and management, while union grievances drew increased tension.

The continued attempts of sexual conduct by Rice against both women, seemingly sanctioned through management's relative inaction and fellow supervisors' active support, undermined any sense of security held by these women. Management removed Rice from their work area and began an investigation which did not include interviews of the victims or their associates. No disciplinary action was taken, and no recognition was granted of the incidents even occurring. Talada suffered anxiety and stress necessitating professional therapy by Dr. Martin Wenzel on May 7, 1990. Ingraham left early from work on February 13, 1991 as a direct result of the scrutiny imposed upon her by management. She had just discovered Kohler fishing through her belongings while Armstrong stood at the door. She reported the incident

---

8. The court noted that "where a low-level supervisor does not rely on his supervisory authority to carry out the harassment, the situation will generally be indistinguishable from cases in which the harassment is perpetrated by the plaintiff's co-workers; consequently, the *Kotcher* standard of employer liability will generally apply, and the employer will not be liable unless 'the employer either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it.'" *Karibian,* 14 F.3d at 780 (quoting *Kotcher,* 957 F.2d at 63.)

to McIntyre who did not personally respond to the scene, but at first offered to send Rice to investigate. Ingraham, of course, took objection to the blatant problem of sending her accused harasser, wherein McIntyre offered to send West. West and Askew came on the scene and immediately demanded to know why Ingraham was outside her work area. After the incident settled down and the three supervisors as well as Askew had left the scene, she returned to work, only to discover both West and Askew sneaking up the stairway to spy on her activities. Not only did management fail to deal with Kohler and Armstrong, they engaged in similar activity of their own. Ingraham, distraught and emotional, claimed "my nerves can't take this. I have to leave." She needed not only the remainder of the shift, but another full day taken from personal time, to recover from the anxiety and tension placed upon her at the job.

The treatment was continuous, with incidents increasing in regularity and severity from April 1990, the time of plaintiffs' filing of union grievances for sexual harassment, through to their respective terminations: Talada in the fall of 1990, and Ingraham in February 1991.

Finally, there exists no evidence whatsoever that Rice's conduct was welcome or invited in any way. The conduct was resisted and reported. Talada even found it necessary to use physical force to manage escape from the treatment.

■■■■ The second element of the *Kotcher* test—that the actionable conduct be imputed to the employer—stands as the easier factor for plaintiff to prove. The first step in analyzing this second element is to determine "whether any of the [individuals involved] can be considered [plaintiffs'] supervisor." *Tomka*, 66 F.3d at 1306. The Second Circuit in *Tomka*, looked to various factors to determine the extent of supervisory capacity each individual had over the plaintiff. The Court examined whether the individual assigned accounts to the plaintiff, whether he reviewed the plaintiff's performance, held direct control over her duties, had power to discharge her, held control over her worksite, or could report unfavorably on her work. *Id.*

In this case, all complained of activity was instigated or perpetrated by an ISS official of supervisory level or higher. All involved, including Rice, Kohler, and even Armstrong, held the power and duty to assign work and worksite, review plaintiffs' work and performance, and report findings to higher levels, or in the case of both McIntyre and Askew, directly terminate. Rice used his supervisory power as a cloak, purporting to hold ISS authority over the plaintiffs that would be used absent their cooperation. Other supervisors joined in the attack. Kohler aggressively sought out both plaintiffs to use his disciplinary sword against them, not making the slightest attempt to hide his contempt of them. McIntyre as ISS Facility Manager of IBM Owego, tacitly condoned Kohler's notorious conduct through his presence and failure to suppress both actions and epithets by Kohler aimed at plaintiffs. Askew, as ISS Branch Manager, determined the action to be taken against Rice, determined the action to be taken against Talada, determined the action to be taken against Ingraham, and conducted himself in the same manner as many of his supervisors. He followed Ingraham both on and off the job. On the job he continually checked on her and her performance, including sneaking up stairways to spy upon her; off the job he followed her to the parking lot or to the bowling alley, and yet when confronted by the union representative's phone call at the bowling alley, refused to deal with the problem outside of work. He condoned the excessive behavior of his supervisors such as Kohler's search through Ingraham's belongings, and even scolded Ingraham at that incident for straying from her work area. He suspended Talada pending an investigation into her alleged stealing of a shake of garlic salt, and ultimately decided to terminate her for that incident. Yet he only changed Rice's work location for four separate allegations of sexual harassment, with no further discipline taken at the time.

■■■■ Numerous attempts were made by the plaintiffs to complain and redress the difficulties experienced on the job. No redress was forthcoming. Ample evidence exists that ISS, through its management and

supervisors, used their apparent authority to their advantage and to the detriment of plaintiffs, and beyond this misuse of power, "provided no reasonable avenue for complaint [and] knew of the harassment but did nothing about it," *Kotcher,* 957 F.2d at 63, thereby subjecting an employer to liability for the actions of even low level supervisors and co-workers. Plaintiffs have shown an actionable discrimination claim, and that the supervisors' actions should be imputed to ISS. *Id.* at 62.

## C. *Retaliation.*

The plaintiffs claim that ISS retaliated against them for undertaking protected actions (i.e. reporting a supervisor for sexual harassment), in violation of Title VII of the Civil Rights Act of 1964. The legal standards for retaliation are identical to those of other Title VII claims.

■ Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–3, states in pertinent part: "It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this title...." 42 U.S.C. § 2000e–3(a). "The phrase 'opposed any practice' encompasses an individual's complaints to supervisors regardless of whether she also files an E.E.O.C. charge." *Lambert v. Genesee Hosp.,* 10 F.3d 46, 55 (2d Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1612, 128 L.Ed.2d 339 (1994); *James v. Runyon,* 843 F.Supp. 816 (N.D.N.Y.1994), *aff'd* 47 F.3d 1158 (2d Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 126, —— L.Ed.2d —— (1995).[9]

"Title VII eliminates certain bases for distinguishing among employees while otherwise preserving employers' freedom of choice." *Price Waterhouse v. Hopkins,* 490 U.S. 228, 239, 109 S.Ct. 1775, 1785, 104 L.Ed.2d 268 (1989). Recognizing the difficulty of proving a Title VII violation such as discrimination or retaliation—claims based on the employer's state of mind—while simultaneously preserving an employer's prerogatives, the Supreme Court has developed

two analytical frameworks which allocate the burden of proof so as to balance these interests.

In *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and later in *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), the Supreme Court developed the three-part burden shifting framework for proving intentional discrimination in the absence of direct evidence. Since proving retaliation follows the same framework as proving discrimination, a review of this analysis is called for.

■ In order for a Title VII plaintiff to establish a claim through indirect evidence, a prima facie case of retaliation must be proved by a fair preponderance of the evidence. *Id.* at 252–253, 101 S.Ct. at 1093–1094; *see also Price Waterhouse,* 490 U.S. at 271, 109 S.Ct. at 1802 (O'Connor, J., concurring) ("The entire purpose of the *McDonnell Douglas* prima facie case is to compensate for the fact that direct evidence of [retaliation] is hard to come by.") Proving a prima facie case of retaliation diverges from the normal discrimination analysis. Whereas, in a claim for discrimination, the plaintiff must prove that: (1) she belongs to a protected class; (2) she was qualified to continue employment; (3) she was discharged; and (4) the discharge occurred under circumstances giving rise to an inference of discrimination, *Montana v. First Fed. Sav. & Loan Ass'n of Rochester,* 869 F.2d 100, 104 (2d Cir.1989); *Song v. Ives Laboratories, Inc.,* 957 F.2d 1041, 1045 (2d Cir.1992), proving a prima facie case of retaliation calls for slightly different factors to be shown (although the factors ultimately result in the same points being made).

■ In order to show a prima facie case of retaliation, plaintiff must show the following different factors: (1) her participation in a protected activity that was known to the defendant; (2) an employment action at the time of, or after the protected conduct occurred, that disadvantaged her; and (3) a causal connection between the protected activity and the adverse employment action.

**9.** In the case at bar, E.E.O.C. charges were both filed and successful in their outcome.

*Tomka,* —— F.3d at ——; *see also Kotcher,* 957 F.2d at 64.

■ Proof of causal connection between the protected activity and the adverse employment action can be established "indirectly, by showing that the protected activity was followed closely by [the alleged retaliatory action], or through other evidence such as disparate treatment of fellow employees who engaged in similar conduct; or directly, through evidence of retaliatory animus directed against plaintiff by the defendant." *Johnson v. Palma,* 931 F.2d 203, 207 (2d Cir.1991) (quoting *DeCintio v. Westchester County Medical Ctr.,* 821 F.2d 111, 115 (2d Cir.), *cert. denied* 484 U.S. 965, 108 S.Ct. 455, 98 L.Ed.2d 395 (1987)).

■ Therefore, a prima facie case that plaintiff was terminated in retaliation for reporting sexual harassment may be found if the following four facts are shown: (1) that plaintiff engaged in a "protected activity," i.e., complaining about sexual harassment by filing a complaint; (2) that the defendant was aware of plaintiff's complaint; (3) that plaintiff was terminated; and (4) that plaintiff's complaint was followed by her termination. *See Cosgrove v. Sears, Roebuck & Co.,* 9 F.3d 1033, 1039 (2d Cir.1993); *see also Thermidor v. Beth Israel Medical Ctr.,* 683 F.Supp. 403, 411 (S.D.N.Y.1988).

■ None of these four factors are in dispute. Plaintiffs grieved Rice's behavior to their union. ISS, through its management and supervisory staff knew of that grievance. Both plaintiffs were terminated, and both terminations occurred subsequent to the grievance. Furthermore the adverse employment action in question entailed more than simple termination. This case involves discipline, suspension, termination, and overall unfair treatment.

■ Establishment of a prima facie case, however, merely raises an inference of retaliation, and "in effect creates a presumption that the employer unlawfully [retaliated] against the employee." *Burdine,* 450 U.S. at 254, 101 S.Ct. at 1094. Once the plaintiff has proven a prima facie case of retaliation, the burden of production then shifts to the defendant "to rebut the presumption of retaliation by producing evidence that the plaintiff was [terminated] for a legitimate … reason." *Id.*

■ Once the defendant offers this type of evidence, the *McDonnell/Burdine* presumption of retaliation drops from the case. *U.S. Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 715, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983). The plaintiff must then persuade the Court that the defendant's proffered reason was merely a pretext,[10] and that she was the victim of retaliation. *St. Mary's Honor Ctr. v. Hicks,* —— U.S. ——, ——–——, 113 S.Ct. 2742, 2747–48, 125 L.Ed.2d 407 (1993) (The plaintiff retains the ultimate burden of persuading the trier of fact that she has been the victim of retaliation.) Therefore, under the *McDonnell/Burdine* framework, the court must not only decide whether the proffered reason for the adverse employment decision is a pretext for retaliation, *Price Waterhouse,* 490 U.S. at 247, 109 S.Ct. at 1788, but must be convinced that there exists no other reasons suggested in the record that may justify the defendant's actions, and that the plaintiff was the victim of retaliation. *St. Mary's,* —— U.S. at ——– ——, 113 S.Ct. at 2755–56.[11]

---

**10.** Plaintiff must demonstrate that the reason is pretextual "either directly by persuading the court that [retaliation] more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095.

**11.** Before *St. Mary's,* a plaintiff could succeed in proving retaliation solely by disproving the truth of defendant's proffered reasons. *Aikens,* 460 U.S. at 716, 103 S.Ct. at 1482; *Lopez v. Metropolitan Life Ins. Co.,* 930 F.2d 157, 161 (2d Cir.), *cert. denied,* 502 U.S. 880, 112 S.Ct. 228, 116 L.Ed.2d 185 (1991). However, *St. Mary's* has worked a significant change in the law.

The fact-finder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show [retaliation]. Thus, rejection of the defendant's proffered reasons, will *permit* the trier of fact to infer the ultimate fact of [retaliation].

*St. Mary's,* —— U.S. at ——, 113 S.Ct. at 2749. As a result, rejection of the defendant's proffered reasons does not *compel* a finding of retaliation, and although the plaintiff need not bring forth

Before this analysis proceeds, however, an alternate method of determining the existence of retaliation must be examined. Since the premise of the *McDonnell/Burdine* pretext analysis is "that *either* a legitimate *or* illegitimate set of considerations led to the challenged decision," *Price Waterhouse*, 490 U.S. at 247, 109 S.Ct. at 1788, that framework is inappropriate in cases where there is direct evidence that retaliation played a part in the employment decision. *Id.* at 246–47, 109 S.Ct. at 1788–89; *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121, 105 S.Ct. 613, 621, 83 L.Ed.2d 523 (1985); *Grant v. Hazelett Strip–Casting Corp.*, 880 F.2d 1564, 1568 (2d Cir.1989). In such a "mixed motives" case, the inquiry is whether retaliation was a substantial or motivating factor in the decision making process. In showing retaliation to be a substantial or motivating factor, plaintiffs need not show the retaliation to be the determinative or deciding factor, or that defendants' decision would have been different, absent this factor. *Price Waterhouse*, 490 U.S. at 250, 109 S.Ct. at 1790; *Grant*, 880 F.2d at 1568; *Berl v. Westchester County*, 849 F.2d 712, 714–15 (2d Cir.1988); *see also Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 285–86, 97 S.Ct. 568, 575–76, 50 L.Ed.2d 471 (1977) (dual motivation/same decision test).

In order to avoid liability then, the burden of proof shifts to the employer to prove by a preponderance of the evidence that plaintiff would have been discharged even if it had not considered retaliation. *Price Waterhouse*, 490 U.S. at 242, 109 S.Ct. at 1786; *Grant*, 880 F.2d at 1568.[12] By thus analyzing the employer's motives, both the employee's Title VII rights and the employer's prerogatives are protected. Admittedly, this analytical framework places a heavier burden on the defendant than *Burdine*; but it is reserved, rightfully so, for those cases in which there is direct evidence of retaliation in the employment decision.

Accordingly, in a Title VII retaliation case, the first determination must be whether to apply a "pretext" or a "mixed motive" analysis. *Price Waterhouse*, 490 U.S. at 247 n. 12, 109 S.Ct. at 1788 n. 12; *Barbano v. Madison County*, 922 F.2d 139, 142 (2d Cir.1990). If the plaintiff has demonstrated through direct evidence that retaliation played a substantial or motivating part in the challenged employment decision, then the mixed motive analysis of *Price Waterhouse* applies. Consequently, the burden shifts to the employer to prove by a preponderance of the evidence that "its legitimate reason, standing alone, would have induced it to make the same decision" at the time the decision was made. *Price Waterhouse*, 490 U.S. at 252, 109 S.Ct. at 1791; *Barbano*, 922 F.2d at 145. In cases where there is direct evidence of retaliation then, the question of "pretext" need not ever be reached. *Grant*, 880 F.2d at 1568.

Alternatively, if the plaintiff cannot offer direct evidence of retaliation, the court must give her the opportunity to prove retaliation through indirect evidence under the *McDonnell/Burdine* "pretext" analysis. *Price Waterhouse*, 490 U.S. at 247 n. 12, 278, 109 S.Ct. at 1788 n. 12, 1805 (O'Connor, J., concurring).

This case presents no direct evidence of retaliation by ISS and consequently must fall subject to the *McDonnell/Burdine* analysis. As stated above, plaintiffs have established a prima facie case of retaliation, and thus have shifted the burden of production to defendants to come forward with a legitimate reason for their actions so as to rebut the presumption of retaliation.

Talada was suspended pending an investigation on August 8, 1990, for being in an unauthorized area of the IBM–Owego kitchen and removing spices from that area. One to two months later at a management/union meeting, Askew was asked by the union to

---

any additional proof of retaliation to succeed, the court must still be convinced that the plaintiff was the victim of retaliation. *Id.*

**12.** In other words, "once the employee proves that the illegitimate reason [retaliation] played a part in the employer's motivation, the employer loses unless the employer can persuade the factfinder that the adverse action would have been taken even in the absence of the illegitimate reason." *Davis v. State University of New York*, 802 F.2d 638, 644 (2d Cir.1986) (Newman, C.J., concurring).

make a determination with regard to Talada, whereupon he terminated her. McIntyre testified that the investigation was still going on at the time of the meeting, and Askew was reticent to make a decision prior to concluding the investigation. The union pushed however, and so Askew terminated her right there.

No legitimate reason was given for closing the investigation at that time. The union sought only to expedite the process of resolving Talada's suspension rather than to end that process in termination. No conclusions had been drawn as to whether Talada had, in fact, breached any company policy that would require discipline over that of her suspension. Certainly no finding stood as definitive proof mandating immediate termination. Askew rendered a snap decision to expand the suspension to termination, with nothing more to base the decision upon than the pressure imposed by union representatives at the meeting. The defendants have failed to show a legitimate reason for terminating Talada, and the prima facie case of retaliation stands.

█ Defendants have explained that the firing of Ingraham on February 14, 1991 was due to gross insubordination from the day prior, February 13, 1991. They point to the accusation that Ingraham gestured with her middle finger to Kohler, that she became argumentative with Askew, disobeyed an order by him to return to her assigned work area, and left work feeling sick, only to be seen at the bowling alley later that evening.

The reasons given, although both questioned and weak, draw legitimacy, and therefore succeed in fulfilling defendants' requirement of providing legitimate reasons in order to overcome a prima facie case of discrimination. The weakness of these "legitimate" reasons comes into play, however, in evaluating whether these reasons were pretextual. Once a legitimate reason has been forwarded, plaintiff bears the burden of persuading the court that either retaliation "more likely motivated the employer or ... by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095.

First, the tone of the supervisory staff calls into question the credibility of the charges. Armstrong testified:

The male supervisors were all talking about the sexual harassment case whenever Ed Rice was there....

Q. What was said about the sexual harassment?

A. That it was bullshit.

Q. What else were they saying?

A. That they didn't think it was right, and Joe got hyped every time he heard them talking about it. He'd say, 'Let's go out and see if we can get them tonight.'

Implicit was a tone condoning Rice's actions and shunning those of Ingraham and Talada in filing a grievance. These conversations occurred daily and often revolved around this subject. McIntyre often included himself in these conversations, and allowed the language to swell to that of abusive and border on violent.[13] During one such conversation about the sexual harassment charges, McIntyre's reaction to Kohler suggesting that they "go out and see if we can get these bitches," and Rice's remark that he would come along, was only to stop Rice since he "was in enough trouble as it was," but not to reprimand Kohler in any way for his attitude or remarks. In questions posed by ISS's attorney, Armstrong also testified as follows:

Q. And do you agree with me, Ms. Sherwood [Armstrong], that there was animosity between Joe Kohler and Bonnie Talada and Roberta Ingraham and Brian Short?

A. He was out to get them.

Q. To get the three of them?

A. The three of them.

Q. And did he ever tell you why?

A. Because he wanted—he was friends with Ed Rice. And he wanted to make it better for Ed, I guess. I don't know.

Q. And did he ever explain that to you, or was this what you—

---

**13.** Armstrong testified that Kohler would refer to Talada and Ingraham as "the fucking bitches."

A. I just observed it.

She added this:

Q. Did Joe Kohler ever write up Bonnie Talada for anything which you consider to be inappropriate?

. . . . .

A. ... [H]e would literally try to find something that they [Ingraham and Talada] weren't doing right and write them up.

Q. And he was successful much of the time, wasn't he?

A. Oh, yeah, he was successful.

Q. Because they didn't do a real good job, did they?

A. They were good workers.

Q. How was he able to write them up successfully?

A. Because he would go out of his way to find something that they weren't doing.

Testimony such as this from a fellow supervisor about the author of the reprimand responsible for Ingraham's termination—who was also accused of searching through the terminated employee's personal belongings—significantly undermines the weight of the reasons for termination. It points to a conclusion that those legitimate reasons proffered by ISS for terminating Ingraham, were pretextual.

## IV. *DAMAGES.*

■■■■ This case represents a classic example of the need for the amendments to Title VII contained in the Civil Rights Act of 1991. Filed subsequent to that Act, these claims arose only months prior, rendering them not subject to the amendments. Thus, blatant sexual harassment, an intensive hostile work environment and widespread retaliation by not one, but several high ranking management officials, afford plaintiffs little in the way of recompense. The Civil Rights Act of 1964, while progressive for its era, offered no opportunity for compensatory damages, let alone punitive damages, and thus, can in many instances fall far short of making whole an injured plaintiff.

■■■■ Plaintiffs are thus limited in the types of damages that they may recover. Specifically, neither punitive nor compensatory damages are recoverable under their Title VII claims. *Walker v. Ford Motor Co.,* 684 F.2d 1355, 1363–64 (11th Cir.1982); *Mason v. Connecticut,* 583 F.Supp. 729 (D.Conn.1984). Following from this exclusion, awards of pain and suffering may not be awarded. *Carrero,* 890 F.2d at 581.

■■■■ Upon a finding of liability, plaintiffs are entitled to back pay from the date of termination until the date of judgment, *Id.; Saulpaugh v. Monroe Community Hosp.,* 4 F.3d 134, 144 (2d Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1189, 127 L.Ed.2d 539 (1994), including prejudgment interest on the back pay award. *Saulpaugh,* 4 F.3d at 145. They are also entitled to costs and reasonable attorney fees. *See Texas State Teachers' Ass'n v. Garland Indep. Sch. Dist.,* 489 U.S. 782, 109 S.Ct. 1486, 103 L.Ed.2d 866 (1989); *see also Albemarle Paper Co. v. Moody,* 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975). Finally, the court has discretion to award plaintiffs front pay, and it is not an abuse of discretion if the court finds that back pay is sufficient. *Saulpaugh,* 4 F.3d at 145; *Barbano,* 922 F.2d at 147. Such a front pay award can be granted where equitable relief in the form of reinstatement may not be feasible or appropriate because the job no longer exists, or the employer-employee relationship has been damaged beyond repair.

### A. *Ingraham.*

■■■■ With regard to back pay for Ingraham, evidence produced at trial showed that she remained out of work from her termination on February 15, 1991, to her reinstatement on June 15, 1991. Evidence places her rate of pay at that time at $8.40 per hour. This amounts to $6,048.00 for the eighteen week period. Defendants argued that since an offer of reinstatement was made to Ingraham prior to June 15, 1991, her back pay award should be limited. It is true that "back pay will no longer accrue if the employer makes an unconditional offer to reinstate the employee, and the employee rejects the offer." *Clarke v. Frank,* 960 F.2d

1146, 1151 (2d Cir.1992). Whether an unconditional offer was in fact made is a question of fact for the district court to determine. *Id.* (Postal Service offer to plaintiff Clark of reinstatement with back pay was found to be unconditional offer). Ingraham was first offered unemployment if she were to tender her resignation. Upon her denial of that offer, defendants offered her reinstatement without back pay, and with the implicit understanding that sexual harassment charges filed by her would be dropped. This offer was not unconditional and will not limit her back pay award.

Since Ingraham's return she has experienced no problems from her employer.[14] She testified experiencing no losses after June 15, 1991.[15] Thus, no front pay or reinstatement is sought by Ingraham herein. Therefore, Ingraham will recover $6,048.00 in back pay. In addition, the court will also award prejudgment interest from June 15, 1991, to this date, compounded annually. *See Reichman v. Bonsignore, Brignati & Mazzotta P.C.*, 818 F.2d 278, 281 (2d Cir.1987); *see also Saulpaugh*, 4 F.3d at 145.[16] *The total back pay award to Ingraham is, therefore, the sum of $8,465.89.*

### B. *Talada.*

██ Talada's damages are not so clear cut. The State Mediation Board granted her reinstatement with back pay and benefits for her entire period of suspension and termination by decision dated March 19, 1991. She was informed of the decision and told to report back to work. She received $13,342.00 and reported back to work that evening.

From the first however, it was clear that the situation hadn't changed. Talada testified feeling excited and happy to be back and was anxious to start work. She received a call to start that night. She drove to work only to be confronted in the parking lot by McIntyre, Askew, and John Irving, a union steward. She testified:

> I had a big smile on my face. I was very happy. And they were smiling, and I didn't even get out of my car. They walked over to the car and they're going like this (gesturing). 'Roll down the window.' So I rolled down the window. And Henry [McIntyre] says to me, 'Bonnie, you cannot come back to work; IBM is denying you access to the facility.'
>
> Q. They had big smiles?
>
> A. Smiles on their face. They were very happy. I went back home and I no more got home than my telephone rang and this was John Irving calling me from IBM. He said, 'Bonnie, you won't believe it.' They were out in the parking lot having a good time.
>
> . . . . .
>
> A. So he says to me, he says, 'I'm going to file a grievance for you for four hours of show-up time,' which he did. And Henry says, 'No problem, I'll pay it. I don't care.'

She was allowed to begin work two weeks later, on the first of April 1991, on a full time status. Yet the harassment and hostility continued. Talada testified about the conditions upon her return.

> [T]hey would give me all the dirty work to do. Anything that was a younger seniority

---

14. She testified as follows:
> Q. You've been treated no different from anybody else at work, have you?
> A. Since I came back from being fired?
> Q. Yes.
> A. I've been treated very fairly, but we have a whole new set of management.

15. She testified:
> Q. Since you returned to work on June 15th, 1991, are you claiming any lost wages of any kind or any dollar damages of any kind?
> A. When I—before that, I had to leave early with them sneaking and following me around on different occasions.

> Court. No, I think the question was after you returned on June 15th, 1991, have you lost any benefits?
> A. Oh, no. No, sir.

16. Prejudgment interest has been determined by annual rates of 10.25% in 1991, 8% in 1992, 7% in 1993, 7.75% in 1994, and 9.25% in 1995. These rates are based on the federal short-term rate pursuant to the Internal Revenue Code, 26 U.S.C. § 6621, guidelines for underpayment of taxes.

person—the youngest seniority person would do, I would be the one to do it, because they abolished the floaters. So that means they can tell you what run to do, and they would give me the worst run that there was to do, or the worst job that there was to do.

Q. And would you finish out the night's work?

A. I never did, no.

Q. Okay. What about your relationships with your co-workers? How were they when you returned to work in 1991?

A. Some were fine. Others didn't want nowheres to be around me, didn't want to work with me for the fact that supervisors were going to be there.

Even though Talada held a full time position, the stress of the harassment prohibited her from working full time. She testified that she had left early because of stress or refused to come to work at all as a result of her inability to deal with the treatment. Talada's full time status allowed her anything but full time work. Her pay stubs report work weeks of 3.5 hours for the pay period of April 25, 1991, 5 hours for the pay period of May 9, 1991, and 6.8 hours for the period of May 29, 1991. She testified:

Court: I want to clean something up. You said you worked two hours, four hours. Does that mean you went in to work and left?

Witness: Correct.

Court: You were supposed to work eight hours but you left after two; is that what you're saying?

Witness: Correct.

This full time status lasted only a short time. Within two months Talada was placed on call-in status. Her name was placed on a list to be called as the demand required. Defendants have presented proof that Talada's downgrade to call-in status was economically justified. Their work force was cut almost in half, from approximately seventy to eighty workers down to forty-seven. They further produced evidence in the form of call sheets that reported attempts made to call Talada into work—both successful and un-

successful calls. However, these sheets are incomplete, only referencing calls made from July 21, 1992 through January 28, 1993, and then jumping seven months before identifying one call recorded on August 16, 1993. No call-in sheets for the remainder of 1991 or the beginning of 1992 were offered into evidence.

 Talada was denied two months of work at full-time status prior to legitimate cutbacks in ISS workforce taking place. Records indicate Talada worked a total of 15.3 hours during that time. Her relative low station in seniority ranks offered her little in the way of protection from the economic axe once that axe fell, and while she suffered from varied and extensive harassment, retaliation, and violations of her civil rights from numerous members of the ISS staff, she may only recover damages suffered as a direct result of those violations. *Saulpaugh*, 4 F.3d at 145 ("Saulpaugh is only entitled to losses suffered 'as a result' of defendants' discrimination."). Back pay is not compensable if lost as a result of economic cutbacks. For the same reason the court in its discretion declines to award front pay or reinstatement to Talada. Her diminution in hours worked and eventual termination resulted from legitimate business decisions and will not be recompensed. Talada has already received back pay through March 31, 1991 from her State Mediation Board Award. Her full time status having ended two months later, requires this court to compensate her from April 1, 1991 through May 31, 1991 in order to grant her entire back pay allotment. ISS set her salary at $8.75 per hour as of March 31, 1991, and testimony from Talada corroborated the accuracy of that figure. Therefore, Talada is entitled to $8.75 per hour for eight 40 hour weeks contained in that two month period. From this amount must be taken the amount actually paid to her for the 13.5 hours worked during those weeks. This leaves an award of $2,682.00. As with Ingraham, Talada is also entitled to prejudgment interest from May 31, 1991, on her award calculated as indicated above. *This sets Talada's total back pay award at $3,835.41.*

Talada made several attempts at finding other employment, but could not find a position for which she was qualified with comparable pay. On July 9, 1993, she took a job at a diner named "J.B.'s Country Kitchen." She eventually bought an interest in the business in October of that year. Her attempts at mitigation of damages are sufficient though unsuccessful. She collected unemployment insurance in the amounts of $3,684.00 for 1991, and $7,849.00 for 1992.

"Unemployment contributions are not 'earnings' for purposes of the section [42 U.S.C. § 2000e–5(g)]. But the court may deduct them from a back pay award as a matter of equity." *Williams v. Secretary of the Navy*, 853 F.Supp. 66, 71 (E.D.N.Y.1994) (citing *EEOC v. Enterprise Ass'n Steamfitters Local No. 638*, 542 F.2d 579, 591 (2d Cir.1976), *cert. denied*, 430 U.S. 911, 97 S.Ct. 1186, 51 L.Ed.2d 588 (1977)). The Second Circuit in *Promisel v. First Am. Artificial Flowers, Inc.*, 943 F.2d 251, 258 (2d Cir. 1991), *cert. denied*, 502 U.S. 1060, 112 S.Ct. 939, 117 L.Ed.2d 110 (1992), noted a difference between unemployment insurance and pension benefits. The latter, they pointed out, should be offset from a back pay award since the source is the employer himself, whereas the unemployment insurance, "coming from a collateral source should not serve to reduce a culpable employer's liability." *Williams*, 853 F.Supp. at 72 (citing *Promisel*, 943 F.2d at 258.) It is in this court's discretion to determine whether or not to deduct the amount of any unemployment insurance received from any damages awarded. *Bonura v. Chase Manhattan Bank, N.A.*, 629 F.Supp. 353 (S.D.N.Y.1986).

The opinion from the Southern District of New York in *Meschino v. Int'l Tel. & Tel. Corp.*, 661 F.Supp. 254 (S.D.N.Y.1987), explained that "it would be inappropriate to deduct unemployment compensation from Meschino's back pay award. Immediately following his termination, Meschino actively sought other employment. Any unemployment benefits he received were not a windfall, but assisted Meschino in his job search." *Id.* at 260.

Talada's award will not be reduced by any unemployment insurance award already collected for the reasoning expressed above.

## V. CONCLUSION.

The plaintiffs are entitled to judgment against both defendants for violating the protections that are due under Title VII. The awards shall only be for back pay including prejudgment interest. Neither front pay nor reinstatement shall be awarded to either plaintiff.

Therefore, it is

ORDERED that

1. Defendants International Service Systems, Inc. and Ed Rice are liable to plaintiff Bonnie Talada in the sum of $3,835.41;

2. Defendants International Service Systems, Inc. and Ed Rice are liable to plaintiff Roberta Ingraham in the sum of $8,465.89; and

3. The clerk is directed to enter judgments accordingly.

Post trial motions to amend the Findings of Fact or Conclusions of Law pursuant to Fed.R.Civ.P. 52(b), for a new trial pursuant to Fed.R.Civ.P. 59, or for relief from judgment or order pursuant to Fed.R.Civ.P. 60, must be filed and served on or before October 24, 1995. Any motions are to be made returnable on November 9, 1995, at 10:00 a.m., in Utica, New York. Opposing papers shall be filed and served on or before November 7, 1995. The Court has no discretion to extend these deadlines. Oral argument will be required.

Motions for attorney fees and expenses pursuant to Fed.R.Civ.P. 54(d)(2)(A), on the Title VII claims may be filed upon further order of this court.

Pursuant to Fed.R.App.P. 4(a)(4) and Fed. R.Civ.P. 58, the time for appeal is extended to thirty (30) days from the entry of the order which disposes of the last post trial motions under Fed.R.Civ.P. 52(b), 59, 60 and 54.

IT IS SO ORDERED.

Dated: October 10, 1995
Utica, New York.