**Farhood AZAR, Plaintiff,**

v.

**TGI FRIDAY'S, INC., Defendant.**

**94 CV–0845(ADS).**

United States District Court,
E.D. New York.

Nov. 15, 1996.

William A. GOMES, Rockville Centre, NY, for plaintiff.

Schnader, Harrison, Segal & Lewis, New York City (M. Christine Carty, of counsel), for defendant.

## MEMORANDUM AND ORDER

SPATT, District Judge.

This case concerns a charge of national origin employment discrimination brought under Title VII of the Civil Rights Act of 1964. The plaintiff, a former employee of the defendant TGI Friday's, Inc., contends that he was discriminated against and discharged at the TGI Friday's Huntington restaurant because he is of Iranian national origin, as evidenced, in part, by referring to the plaintiff as the "Ayatollah" in a persistent and derogatory manner.

### THE TRIAL—FINDINGS OF FACT

The plaintiff Farhood Azar (the "plaintiff" or "Azar") was born in Tabriz, Iran and arrived in the United States on October 9,

\* Tr. refers to the trial transcript.

1979. He is married and is presently a United States citizen. Azar speaks with a noticeable foreign accent. The defendant TGI Friday's, Inc. (the "defendant" or "TGI Friday's") is a corporation that owns and operates restaurants which serve a "broad spectrum of different diverse foods" including salads, sandwiches, burgers, pasta and baked foods. (Tr. at 276) \*. TGI Friday's also owns an affiliate restaurant known as Dalt's in Addison, Texas.

Azar had an extended employment history with TGI Friday's restaurants. The plaintiff first worked for the defendant in its Dalt's affiliate in Addison, Texas as a baker prep cook from September 10, 1982 to May 5, 1984. A baker prep cook prepares the baked goods such as cakes and desserts for use in the restaurant. He was then employed by TGI Friday's in Addison, Texas, again as a baker prep cook, from May 10, 1984 to November 15, 1984. Azar was then employed at the TGI Friday's in Plano, Texas as a baker prep cook from February 27, 1985 to April 30, 1985. Then Azar returned to Dalt's as a baker prep cook from May 2, 1985 to May 23, 1985.

With regard to Azar's first employment in Dalt's, he was disciplined twice for lateness. However, on January 10, 1983, it was noted in his personnel file that he was a "valuable asset to the setup of the salad area. Works fast and organized." (Defendant's Exh. F). On or about May 5, 1984, during a shift at Dalt's, Azar walked out and he was terminated. During his employ at the TGI Friday's at Addison, Azar received a warning for unsatisfactory performance and tardiness (Defendant's Exh. G). While at TGI Friday's at Addison, on October 16, 1984, he was the subject of a "Notation of Incident" in which it was stated "Two hours late for his shift. Action taken warning." (Defendant's Exh. G). Azar was terminated from TGI Friday's at Addison on November 15, 1984 because of "failure to comply with work rules—follow recipes and uncooperative work attitude" (Defendant's Exh. G).

Azar's employment at TGI Friday's at Plano, Texas was terminated on April 30, 1985,

after two months on that job, because he walked off his shift (Defendant's Exh. H). His second employment at Dalt's was terminated on May 23, 1985, after 21 days, when he did not arrive for his shift and, when called, "stated he wasn't coming in for work" (Defendant's Exh. I). Azar testified that he was unhappy with the work conditions at Dalt's. Prior to that termination, Azar received a warning and Notation of Incident for poor performance and tardiness (Defendant's Exh. I). Azar testified as to these four successive terminations from the Texas TGI Friday's and Dalt's that he was not harassed at these restaurants and that he "walked out three times" and was fired one time.

The Court finds that the plaintiff tried to conceal his prior employments with TGI Friday's and Dalt's by failing to disclose these positions when he filled out a job application on June 17, 1993 (Defendant's Exh. AR), in which he made other false statements. In addition, on April 19, 1994, Azar filled out another job application in which he again failed to mention any of the four TGI Friday's—Dalt's employments. (Defendant's Exh. AV). The plaintiff explained this failure to reveal his prior TGI Friday's employments by noting that the positions he was applying for were in cost accounting and that, therefore, his "baker prep" jobs would not be relevant.

Azar was hired at the TGI Friday's at Huntington, the restaurant at issue in this case, on July 24, 1989 and he was involuntarily terminated on September 11, 1989. He worked at the Huntington restaurant for approximately one month and 18 days, or 35 working days. He was initially hired as a baker prep cook. He also worked as a fry cook making fried food such as french fried potatoes and fried shrimp. In 1989, at the time of his employment, Frank Kasper ("Kasper") was the General Manager of the restaurant, Lance Wolff ("Wolff") was an Assistant Manager and Terrance O'Deens ("O'Deens") was the Kitchen Manager. General Manager Kasper was in overall charge of the restaurant and "does the hiring and firing" (Tr. at 70). Kitchen Manager O'Deens directly supervised the cooks in the kitchen. However, Azar testified that most of the time, Assistant Manager Wolff also supervised the kitchen personnel.

Azar explained that the term Ayatollah "means the leader who threw away the Shah of Iran" (Tr. at 72). He testified that the term "Ayatollah" was stated by persons in the kitchen of TGI Friday's at Huntington to refer to him in a derogatory fashion. In particular, Azar testified that two days after he was hired, Wolff said to him, "I didn't know he is a fucking Iranian." After that, Wolff started calling him Ayatollah. Azar testified that when Wolff used the term Ayatollah, he did so with hate and anger "in his face ... like I have a disease." Azar testified that only one other person called him Ayatollah, a cook shift leader named "John", who stopped using that name as soon as Azar told him not to do so.

Azar further testified to this name calling:

Q   How often did Mr. Wolff call you Ayatollah?

A   Every shift I was working with him.

Q   Did he call you any other names or terms?

A   Yes, sir.

Q   What were they?

A   Ayatollah, fucking rocking roller. Ayatollah, assholer.

Q   How often did Mr. Wolff give—call you those names?

A   Every time he was reading, and he started calling—wasn't calling my name, Fred, he was saying Ayatollah, two french fries, Ayatollah, two fried mushrooms, like that, every time he was reading the order.

Q   And how long did the use of those two names go on, those names?

A   During the time I was employed at TGIF during Huntington.

.  .  .  .

Q   And when did you have such conversations with him?

A   Well, I tried to ignore him. But one time in the meeting he made fun of my nationality. He made joke of my nationality and everybody laughed.

Q   Mr. Azar, I want you to go back a step.

First of all, when was that meeting?

A  That was one of the daily meetings. We have everyday meeting before the shift starts.

Q  And what did Mr. Wolff say specifically?

A  He said, Fred, aren't you glad you are in America, you are not in Iran no more? And he said something, I don't remember. And everybody laughed.

So, when the meeting is over, I called him and I told him, I don't like calling me the name. I don't like making joke of me. My name is Fred.

(Tr. at 73–75).

The Court credits this testimony and finds that these occurrences took place.

Azar testified that, despite his telling Wolff not to call him by that term, he continued to do so. Wolff called the plaintiff Ayatollah for the entire time the plaintiff worked in the Huntington restaurant. Azar denied that he himself used the term Ayatollah to describe himself. The Court credits this testimony. In this regard, the Court finds that Azar did not refer to himself as the "Ayatollah". This was a name fostered on him by the TGI Friday's employees, notably Lance Wolff. The Court notes the following testimony by Azar, which the Court believes:

Q  Did you hear him (Kasper) describe Ayatollah as a pet name of yours?

A  Yes, I heard that.

Q  What was your reaction to that?

A  When, yesterday?

Q  When you heard him say that was your pet name?

A  It wasn't my pet name. I didn't call myself pet name. That's not true.

Q  Why not?

A  Because this man destroyed my country. I have bad memory from him. Ayatollah Khomeini killed 100,000 people. He destroyed my country. He took freedom of my people in my country and on top of this, he killed my father.

(Tr. at 417).

Azar conceded that he did not speak to General Manager Kasper about the name calling. However, he testified that Kasper overheard Wolff calling him Ayatollah and smiled. The Court credits this testimony.

With regard to the quality of his work at the Huntington restaurant, Azar testified that he was not evaluated. However, he stated that "they used to pat me in the shoulder and telling [sic] me I did a good job ..." (Tr. at 85). He stated that neither Kasper nor Wolff nor anyone else ever criticized his work. He was paid an hourly wage, which was $8.00 per hour. Azar worked different time schedules and worked overtime from time to time. Even though Azar was supposed to check in with his time card, he testified that on many occasions, he was told that the manager would check him in. With his overtime Azar averaged approximately $500.00 per week. His benefits included sick leave, medical benefits, vacation and holidays.

As to punctuality, Azar testified that he was late on only one occasion, when there was an accident on the road, and he was 20 to 25 minutes late. He states that he received no written memorandum or oral reprimand with regard to this lateness. This issue was disputed by the defendant. The Court finds that the defendant intentionally and falsely enhanced the lateness issue, as will be explained later in this opinion.

On September 11, 1989 Azar was discharged. He testified that he was fired by Kasper and Wolff. The reason they gave was that he was "slow." Azar stated that he was never told previously that his work was slow, nor did he receive any such notification in writing. In addition, he testified that nothing was mentioned about him being late. The Court credits this testimony concerning the plaintiff's alleged lateness.

Azar was familiar with the contents of the TGI Friday's "Employee Handbook." He knew about the "Open Door Policy" of the company "to treat one another with respect and dignity ... (and) to prohibit racial or ethnic slurs or racial or ethnic joking among employees." In the event of such discriminatory conduct, the Handbook advised employees to report such activity to their supervisor. The Handbook further relates "should the activity continue, call the Manager of

Employee Relations, 1–800–347–5757, ext. 5408 at the company's expense." In addition, the Handbook stated:

This being so, the Company maintains an Open Door Policy. All employees can ask questions of anyone, at anytime, about anything, and receive an answer. It is the employees' responsibility to respond quickly and clearly to questions asked of them, to insure clarity and understanding throughout our organization. You are encouraged to take full advantage of this opportunity, without fear of reprisal. When you have a question or concern, your supervisor is in the best position to respond quickly and accurately. If you want further clarification, speak with any other person in management, regardless of title, with whom you feel comfortable.

Notwithstanding Azar's conceded familiarity with the Handbook, and the above-cited provisions in particular, he made no complaints to his supervisors about discriminatory practice but he did call to discuss this matter with Juanita Nanez, the Director of Employee Relations after his termination.

On August 10, 1989, while working at the Huntington restaurant, Azar was late for work and a Notation of Incident was placed in his personnel file (Defendant's Exh. J). As stated above, he testified that he was late for work that day because "there was a car accident on the road." However, according to the TGI Friday's time cards, the plaintiff was late ten times in the less than two months he worked at the Huntington restaurant. Azar denied he was late except for the one incident on August 10, 1989, described above. The Court does not credit these alleged nine other late incidents. The time cards are marked with the handwritten word "late", written in by Kasper, all apparently at the same time. The words "late" were apparently inserted in the time cards by Kasper after the plaintiff was terminated.

On August 24, 1989, Azar was the subject of another "Notation of Incident" (Defendant's Exh. S). This concerned his "low output" and stated "Fred is not being productive. He has to work faster and pick up his pace. Second time he was spoken to." While Azar denied that this incident took place or that Manager Kasper spoke to him concerning this matter, he conceded that Kasper told him, "you can do better."

Azar was terminated on September 11, 1989. The time record indicates that Azar arrived on the job that day at 15:11 (3:11 P.M.) and left at 15:32 (3:32 P.M.). In a meeting with Manager Kasper, he was told that his production was not good and he was "kind of slow." Azar denied that this was true and contends that his production was good and he was not slow.

Cynthia Harris, formerly known as Cynthia Gordon, was employed by the defendant as a line cook from 1987 to March 7, 1992. Harris was terminated by TGI Friday's when she returned from a vacation one day late. She supported the plaintiff's testimony as to the use of the word "Ayatollah" by personnel at the Huntington TGI Friday's. Harris testified that she heard the term "Ayatollah" first used by Assistant Manager Mark Soroka. Then, she stated, the term was "carried on, like a domino effect" by the entire line of cooks and all the managers. She named the managers who used this term as Assistant Managers Lance Wolff, Mark Soroka and John Hugill and Manager Frank Kasper, and "some that left." Harris further testified that the managers used the term "whenever he was on, whenever he worked." She stated that it started to be used by Soroka "like the song." After a few weeks, Azar started "getting a little upset when the term was used ... he wanted us to stop ... it never stopped." She heard Azar speak to Wolff on several occasions and tell him that "it bothered him, it offended him," but it never stopped. Harris stated that Manager Kasper was not present at any of these conversations. Harris was asked to describe the manner in which the term "Ayatollah" was used:

Q   And when they used this term to describe Mr. Azar, was it said directly to him or was it said to other people?

A   I don't know. They would stand at the end of the line.

I have to say this: It was a fun place to work. We were all like family. So it wasn't directed to him. Like when they

would come on the shift or whatever, that was a way of like saying, you know, hi, or whatever.

Like we had different names for certain people. It didn't start off like harsh to this man until it started to become upsetting to him. It wasn't like, you, Ayatollah, until after it became upsetting.

Q After it started to upset him, did they ever stop using the term?

A. No.

(Tr. at 17–18).

Harris further stated that the plaintiff never used the term "Ayatollah" to describe himself or about himself. The Court credits this testimony. Asked to describe the manner in which Azar performed his job, she stated "his food came out good in my opinion, very good."

Harris testified that she was familiar with the defendant's "open door policy" against discrimination and to respect each other and that the policy was followed in the Huntington restaurant kitchen in 1989. Harris received negative evaluations on June 28, 1991, July 8, 1991, July 17, 1991, December 9, 1991 and March 6, 1992. Harris disputes some of these poor performance citations. She was discharged by Manager Kasper on March 7, 1992 for not returning from vacation on time.

In the defendant's case, Juanita Nanez, the TGI Friday's Director of Employee Relations, explained the company's "open door policy," which encourages all employees to complain about any discrimination conduct without fear of retaliation. She reviewed the defendant's "Credo" or philosophy which is to treat all persons with respect and fairness.

In 1989, the plaintiff called Nanez after his termination. He said he was harassed and terminated because of his national origin. Nanez investigated the plaintiff's allegations by reviewing his work records and interviewing the Manager and Assistant Manager at the Huntington restaurant. She concluded that Azar had a poor work history in the company and "there was no harassment and that his termination had nothing to do with his national origin." Nanez based this latter conclusion on the information furnished by the manager that "he (Azar) called himself

the name Ayatollah, and in fact, introduced himself as such and would joke about it." As stated above, the Court finds that the use of the term "Ayatollah" was not initiated by the plaintiff himself.

On cross-examination, Nanez testified that Frank Kasper wrote the word "late" on the plaintiff's time cards, and that she relied on Kasper's notations. The time cards indicated that Azar was late ten times as set forth in the Nanez letter to the Human Rights Commission dated December 20, 1990 (Defendant's Exh. AA) as follows:

| | | |
|---|---|---|
| July 26, 1989 | — | 2 hours and 45 minutes late |
| July 30, 1989 | — | 3 hours and 12 minutes late |
| August 3, 1989 | — | 30 minutes late |
| August 10, 1989 | — | 25 minutes late |
| August 21, 1989 | — | 3 minutes late |
| August 22, 1989 | — | 2 minutes late |
| August 28, 1990 | — | 13 minutes late |
| September 1, 1989 | — | 4 minutes late |
| September 4, 1989 | — | 3 minutes late |
| September 11, 1989 | — | 11 minutes late |

However, despite these ten alleged late incidents, there was only one Notation of Incident report filed, the one for August 10, 1989, an alleged lateness of 25 minutes. Queried as to why no other incident reports were filed, especially for the July 26 incident allegedly involving a lateness of 2 hours and 45 minutes, and the July 30, 1989 incident allegedly involving a lateness of 3 hours and 12 minutes, Nanez responded that Kasper said "he was overly lenient with the employee and in fact he was quite embarrassed that he hadn't done documentation on that." (Tr. at 254). The Court notes that six of the ten alleged incidents involved a lateness of two to thirteen minutes. The Court finds that these late incidents were placed in the record subsequent to the plaintiff's termination in an effort to explain the plaintiff's discharge. The Court finds this to be very odd, and, with regard to the four incidents of alleged lateness of four minutes or less, doubts that such a short late period would be so precisely remembered after his termination.

The Court also notes that the defendant's termination record (Defendant's Exh. J) lists the reason for the plaintiff's discharge as "unsatisfactory performance/low output." There is a space for "failure to show up for a shift" and there is also a space for "other" reasons. Neither of those spaces were checked. Significantly, not a word about

lateness appears on the defendant's termination record. Moreover, Nanez conceded that the first time the issue of "lateness" was raised was at the Human Rights Commission fact-finding meeting:

Q Can you tell me where on the involuntary separation record it indicates that Mr. Azar was terminated for lateness or tardiness?

A It doesn't. It lists the primary reason which was unsatisfactory performance and low output.

Q So the first time the issue of lateness was raised was after the Human Rights—

A At the facts finding conference.

Q At the fact-finding meeting?

A Yes, sir.

(Tr. at 256–257).

The Court finds that the plaintiff proved, by a preponderance of the evidence, that he was not discharged for being late. His alleged lateness was inserted in the records after the plaintiff's termination to attempt to provide a valid non-discriminatory reason for his termination. The Court finds that the plaintiff's alleged lateness was not the true reason for his termination.

Constituting a material admission, in a letter to the Human Rights Commission dated December 8, 1989 (Plaintiff's Exh. 7), Nanez conceded that the word Ayatollah had been used by Assistant Manager Wolff in regard to Azar:

In investigating Mr. Azar's allegations and talking to employees at the restaurant, I learned that Mr. Azar had referred to himself, and given himself, the pet name "Ayatollah." *Yes, Mr. Lance Wolff, Associate General Manager, called Mr. Azar "Ayatollah,"* not intentionally, maliciously or derogatorily to harm Mr. Azar, but because he was led to believe Mr. Azar preferred to be called by that pet name since he often referred to himself that way. *Please find enclosed a statement from Mr. Wolff (Exhibit 1) confirming the above.* As well, Mr. Wolff adamantly denies that Mr. Azar ever complained to him of the way he was treating Mr. Azar. (Emphasis supplied).

In the handwritten statement of Lance Wolff dated November 9, 1989, which was annexed to the Nanez letter to the Human Rights Commission, Wolff stated:

The situation with Fred Azar was that Itolia [sic] Fred used to call himself the Itolia of Rock–n–Roll a lot of times during his stay with Friday's, in Huntington. We used to laugh about it a lot. I would treat Fred with the utmost respect just like any other employee at the restaurant. Nothing was said to Fred that was discriminatory. Fred was let go because of low productivity and lateness. I never had any personal problems with Fred myself and as far as I knew he never had any problems with me.

I thought Fred was a nice guy and tried real hard in his job.

Nanez was asked about this "Ayatollah" situation between Azar and Wolff and how it related to the defendant's "open door" non-discriminatory and respect for one another's policies. Significantly, Nanez found the conduct of both Wolff and Azar to be inappropriate.

Q Did you find anything inappropriate about him being called that name?

A What I counseled Mr. Wolff on, he should not allow employees to make jokes about themselves but it puts others in a awkward situation as to how to respond to that and that he should not have allowed that type of behavior.

Q What was Mr. Wolff's position at that time?

A He was one of the managers.

Q And is this form of joking, was it inappropriate as far as you were concerned as EEO officer?

A Mr. Ayatollah—I apologize, Mr. Azar making these remarks about himself and him calling himself the Ayatollah was inappropriate. People responding with laughter was inappropriate and the manager not talking to Mr. Azar about quitting this conduct was inappropriate.

Q Was there any discussion had with Mr. Wolff as to whether he had used the term?

A Yes, sir.

Q *And had any manager used this form of name calling, it would be inappropriate, as far as you were concerned?*

A *Yes, sir.*

(Tr. at 261–262) (emphasis supplied).

Oscar Sanchez is an Assistant Kitchen Manager at the TGI Friday's restaurant in Huntington. In 1989 he was a cook at the same restaurant. He recalls the plaintiff only "a little bit." However, Sanchez remembers that he and others called the plaintiff Ayatollah. Sanchez testified that Azar himself used the term while laughing and looking "like he's having fun." In fact, while other persons used the term Ayatollah "everybody is having fun." Asked whether Wolff ever showed disrespect for Azar, he answered equivocally, "I don't think so."

Frank Kasper is presently the Director of Operations for the TGI Friday's Philadelphia and Northern New Jersey markets. In this capacity he oversees the operation of seventeen company and franchise restaurants. During the period of time at issue he was the General Manager of the Huntington restaurant. Kasper interviewed the plaintiff when he applied for a job at the Huntington restaurant. He knew that Azar "was an experienced cook from Friday's in Texas" and he hired him. He did not check the plaintiff's references. The plaintiff started his employment at the Huntington restaurant on July 24, 1989. Azar had in-store training as a fry cook and a baker prep cook and received certifications in those capacities indicating that he met the minimum requirements.

Kasper worked at the restaurant between 50 to 60 hours per week, spending some time in the kitchen. Among the managers at that time were Kitchen Manager Terrance O'Deens and Assistant Manager Lance Wolff. The duties of the Assistant Manager was to "run the day-to-day business, run shifts in the restaurant ... (and) to oversee various departments in the restaurant." The assistant managers also were in the restaurant for many hours each week. The assistant managers report to Kasper about the performance of employees either verbally or by a note in the manager's log or by a Notation of Incident Report.

Kasper observed Azar's performance about two to three times a week. Prior to August 10, 1989, Kasper had conversations with O'Deens and the other assistant managers about Azar's "tardiness problem." He talked to O'Deens about the problem five to seven times. Kasper described the plaintiff's performance as being tardy "throughout, from the beginning to the end of his employment." Yet, the Court notes again only one Notation of Incident for tardiness was in the file, and that was for a 25 minute lateness. Kasper testified that he spoke to Azar about his tardiness "six times or so." Based on his personal observations and feedback from the assistant managers and other employees, Kasper concluded that "Mr. Azar struggled getting the job production done in the allotted hours of time that we normally give them to be finished by, as well as a fry cook he seemed to be behind getting the orders out to the guests." Kasper stated that Azar was not completing his work in a timely fashion. In addition, he testified that Azar was easily distracted and joked around with other employees. He talked to Azar about his performance several times and documented his concerns in a August 24, 1989 Notice of Incident in which he stated "Fred is not being productive. He has to work faster and pick up his pace." (Defendant's Exh. S).

Kasper stated that although he prepared the "work faster" Notation of Incident on August 24, 1989, and signed it on that date, for some reason the date affixed next to his signature was September 17, 1989, six days after the plaintiff was terminated. Moreover, Kasper conceded that he may have complimented an entire shift, by going down the line of cooks and saying "great job" and Azar may have been in that shift. Kasper decided to terminate Azar on September 11, 1989 allegedly because of his low productivity and tardiness.

On that same date, September 11, 1989, Kasper filled out an involuntary separation record stating that the plaintiff was terminated that day because of "unsatisfactory performance/low output." In addition, Kasper testified that, although not mentioned in the record, timeliness was a factor in his decision to terminate the plaintiff. Kasper testified

that it was solely his decision to terminate Azar's employment in the Huntington restaurant.

Kasper also explained the time card and "punching in" system. As did Azar, Kasper testified that sometimes the employees did not punch in the time cards. At busy times and night time and at "split-times" often the employees would not "punch-in". With regard to Azar's time cards (Defendant's Exh. AB), Kasper testified that he wrote the word "late" on the cards:

Q When did you place the handwriting that indicates "late" on Exhibit AB?

A Again, looking back to seven years ago, if an employee was late on a shift, I would make a notation and either circle it that day or before the week was over look at the time cards and saying, by the way, this employee was late 20 minutes or an hour and circle it and make a notation.

. . . .

Q What was that?

A With 150 employees in the restaurant, it would be kind of difficult standing there all day and clocking employees in. On a different shift we would have an average of 50, 60 employees each day, any given shift.

(Tr. at 316–317, 322).

With regard to the discriminatory issue, Kasper conceded that he heard the word "Ayatollah" used by other employees in reference to the plaintiff on several occasions. However, he stated that the term was used by Azar "as a pet name for himself." Kasper testified that when Azar called himself the Ayatollah, he had a happy expression on his face and was having fun with his fellow employees. He himself never called Azar "Ayatollah." However, Kasper conceded that he should have stopped this banter involving the use of the term "Ayatollah."

Q And you are familiar with the employee handbook in 1989?

A Yes.

Q Looking at Exhibit X which is up there, second page.

Do you see the notation in the book with regard to using ethnic slurs and ethnic jokes?

A I'm trying to find it on here. Hold on a second.

(Perusing.) Yes.

Q As part of your duties as the general manager, weren't you supposed to enforce that company policy?

A I probably should have stopped it at that point, even if he was calling himself the names or somebody else calling him the names.

Q You never did that, did you?

A No, because again as we stated, it seemed to be in a joking manner. It seemed to be that he enjoyed the situation with himself and his peers.

(Tr. at 363).

As stated above, Lance Wolff was an Assistant Manager at the Huntington restaurant at the time of Azar's employment. Among his duties was to help the Kitchen Manager. When he first met Azar in the kitchen, he spoke to him in Spanish and was advised by Azar that he was not Spanish. Curiously, Wolff testified that, when he first met him the plaintiff said "I didn't have to call him Fred, he said I could call him the Ayatollah." The Court finds this highly unlikely and does not credit this testimony. Wolff conceded that he "probably" called Azar by the name "Ayatollah":

Q Did you address him after that introduction by the term "Ayatollah"?

A I probably said it once to him as I recall him saying that's what he wanted to be known as.

Q And when you spoke to him using that word, did you observe his face?

A Yes.

Q Did you hear his voice?

A Yes.

Q What did his face look like?

A There was no indication of him being upset. I mean, he introduced himself, he said to me, I could call him Ayatollah, so there were no facial gestures thinking that he was upset in any way.

Q What was the tone of voice he used after you used that word?

A Very natural, just as he introduced himself to me as Fred.

Q Did Mr. Azar ask you to stop using the word?

A Not to me, no.

. . . .

Q In your various shifts at the Huntington location and the times that you went into the kitchen, did you have occasion to hear others use the word in talking to him, the word being the word "Ayatollah" in talking to him?

A Quite frequently, yes.

. . . .

Q Now, did you hear others calling him that at that time?

A Throughout the kitchen, sure.

. . . .

Q At any time did Mr. Azar ask you to stop calling him the name "Ayatollah"?

A To my best recollection, no.

(Tr. at 369–370, 372).

The Court notes that when Wolff was asked by the defendant's attorney whether Azar asked him to stop calling him by the name "Ayatollah", he answered in an equivocal manner, "To the best of my recollection, no." Asked the same question a second time by the defendant's attorney, Wolff answered "I never recall that. I don't recall that at all." One would think that in response to such a crucial question, the answer would have been an affirmative and resounding "No." With regard to the plaintiff's performance, Wolff testified that "his speed and performance was not to the standard of a Friday's line cook." Wolff also stated that "Azar had a habit of being late." He can "definitely" recall one or two such occasions. The Court does not credit the testimony of Wolff.

Terrence R. O'Deens, Jr. was the Kitchen Manager at the Huntington restaurant during the period of time at issue. He was responsible for everything that took place in the kitchen. As his immediate supervisor, O'Deens observed the plaintiff's performance as a baker prep and fry cook and concluded that he didn't meet their performance levels with regard to productivity, in that others in the kitchen were more productive. O'Deens also testified "that there was somewhat of a tardiness issue" and I "assume" that I talked to him. This was certainly not a ringing condemnation by the assistant manager directly in charge of the plaintiff's activities.

With regard to the use of the term "Ayatollah", O'Deens testified that he never heard that term used. Asked whether Azar ever complained to him about the use of the term with respect to him, O'Deens testified in the now familiar manner, "Not that I ever recall, no."

## DISCUSSION

### I. *The Applicable Standard.*

The attorneys for both parties agree that this Title VII discrimination case should be governed by the *McDonnell Douglas–Burdine–Hicks* analysis. In Point 1 of the plaintiff's memorandum of law, at page 2, it is stated ". . . the *prima facie* case rule set forth in *McDonnell Douglas v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) should apply." In the defendant's post-trial memorandum, at page 1, the memorandum opens with the words:

1. This Court should apply the burden shifting standard set forth in *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993), *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) does not apply because the plaintiff, Farhood Azar ("Azar"), failed to prove by a preponderance of the evidence that his national origin was a determinative factor in the decision of the General Manager to terminate the employment of Azar at TGI Friday's in Huntington.

■ Employment discrimination cases fall into one of two categories, (1) the *McDonnell Douglas–Burdine–Hicks* "pretext" case, or (2) the *Price Waterhouse* "mixed motive" case.

A. *The McDonnell Douglas–Burdine–Hicks "Pretext" Cases*

The standards of proof set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 798, 802–805, 93 S.Ct. 1817, 1822, 1824–1826, 36 L.Ed.2d 668 (1973) are intended "progressively to sharpen the inquiry into the elusive factual question of intentional discrimination," *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 255–256 n. 8, 101 S.Ct. 1089, 1094–1095 n. 8, 67 L.Ed.2d 207 (1981). The plaintiff has the burden of establishing a *prima facie* case of unlawful discrimination. This burden of proof is a light one. *See Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093–1094. In the first tier of the *McDonnell Douglas* standard to establish a *prima facie* case in this national origin discrimination case, the plaintiff must prove four elements:

(1) the plaintiff is a member of a protected class;

(2) the plaintiff was qualified for the job he held at the time of his termination;

(3) the plaintiff was terminated from his job; and

(4) his termination occurred in circumstances giving rise to an inference that it was based on the plaintiff's Iranian national origin.

The next two tiers are as described in *Fisher v. Vassar College*, 70 F.3d 1420 (2d Cir.1995), and even more recently in *Chertkova v. Connecticut General Life Insurance Co.*, 92 F.3d 81 (2d Cir.1996). If the plaintiff presents a *prima facie* case, a presumption of unlawful discrimination arises. In the second tier, the burden of production shifts to the defendant-employer, who is required to demonstrate a legitimate non-discriminatory reason for the termination. *See Gallo v. Prudential Residential Services, Limited Partnership*, 22 F.3d 1219, 1226 (2d Cir. 1994). In the third tier, if the defendant-employer satisfies this burden of production, the plaintiff then has the ultimate burden to prove that: (1) the employer's reason was merely a pretext and was not the true reason, *and* (2) that the real reason was discrimination. *See Hicks*, 509 U.S. at 515, 113 S.Ct. at 2751–2752; *see also Holt v. KMI–Continental, Inc.*, 95 F.3d 123 (2d Cir. Sept. 4, 1996). Thus, even if the defendant's reasons are found to be pretextual, the plaintiff must, nevertheless, prove that he was terminated as a result of intentional discrimination. "It is not enough ... to disbelieve the employer: the factfinder *must* believe the plaintiff's explanation of intentional discrimination." *Hicks*, 509 U.S. at 515, 113 S.Ct. at 2762. However, this proof may be inferred from proof of the four elements of the *prima facie* case.

B. *The Mixed Motive Theory*

Under the mixed motive theory, a plaintiff "must initially show more than the 'not onerous' *McDonnell Douglas–Burdine* factors." *Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1181 (2d Cir.) *cert. denied* 506 U.S. 826, 113 S.Ct. 82, 121 L.Ed.2d 46 (1992). The burden of proof on the plaintiff is more stringent in a "mixed motive" cases than in a "pretext" case.

The "mixed motive" standard was recently reiterated in *de la Cruz v. New York City Human Resources Administration Department of Social Services*, 82 F.3d 16 (2d Cir.1996), as follows:

In a "mixed motives" case, a plaintiff must initially proffer evidence that an impermissible criterion was *in fact* a "motivating" or "substantial" factor in the employment decision. *Price Waterhouse v. Hopkins*, 490 U.S. 228, 258, 109 S.Ct. 1775, 1794–95, 104 L.Ed.2d 268 (1989); *Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1181 (2d Cir.), *cert. denied*, 506 U.S. 826, 113 S.Ct. 82, 121 L.Ed.2d 46 (1992). This burden is greater than the level of proof necessary to make out a *McDonnell Douglas prima facie* case. Once the plaintiff offers such evidence, the burden shifts to the employer to demonstrate that it would have reached the same decision even in the absence of the impermissible factor. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977); *Tyler*, 958 F.2d at 1181.

The key question in a mixed motive inquiry is what the plaintiff has to demonstrate in order to trigger this theory. In the

Second Circuit, the plaintiff is required to adduce "enough evidence that, if believed, could reasonably allow a jury to conclude that the adverse employment consequences were 'because of' an impermissible factor." *Id.* at 1187. The Second Circuit rejected the notion that the plaintiff must introduce "direct" evidence of discrimination, such as an admission by the decisionmaker that "I fired the plaintiff because she was a woman", as opposed to circumstantial evidence. However, if the plaintiff relies on circumstantial evidence, "that circumstantial evidence must be tied directly to the alleged discriminatory animus." *Ostrowski v. Atlantic Mutual Insurance Cos.*, 968 F.2d 171, 182 (2d Cir.1992).

In *de la Cruz, supra,* it was held that statements concerning a person of Hispanic heritage that his problems were "cultural" and that the plaintiff and his new Hispanic superior "will understand each other better" were made in the context of a justified concern over language skills, "and are not evidence of discrimination." *Id.* at 23.

Under the particular facts of this case, the Court finds that the plaintiff has established the more stringent "mixed motive" case. However, as the following analysis is designed to demonstrate, the plaintiff would prevail under either theory of employment discrimination theory.

## II. *The McDonnell Douglas–Burdine–Hicks Analysis*

As to the first tier, the Court finds that the plaintiff has proved a *prima facie* case. The first element is satisfied because the plaintiff is a member of a protected class, namely, a person of Iranian national origin. There is also no dispute as to the third element, that he was discharged by the defendant on September 11, 1989. The second and fourth elements are contested by the defendant.

The second element that the plaintiff must prove, by a preponderance of the evidence, is that the plaintiff was qualified for the position of baker prep cook or fry cook at TGI Friday's Restaurant. The defendant points to the Notation of Incident concerning his "low output" and "not being productive," in addition to the testimony of the defendant's employees, to support its position that the plaintiff was not qualified. The question presented is whether the plaintiff was reasonably competent and was performing his job at a level which met his employer's reasonable and legitimate expectations. *Douglas v. PHH FleetAmerica Corp.*, 832 F.Supp. 1002, 1009 (D.Md.1993).

In *Owens v. New York City Housing Authority*, 934 F.2d 405, 409 (2d Cir.1991) *cert. denied*, 502 U.S. 964, 112 S.Ct. 431, 116 L.Ed.2d 451 (1991) it was held that a plaintiff needs "only a minimal showing of qualification to establish a *prima facie* claim." In addition, it was stated in *Owens* that an employee "only needs to demonstrate that [he] possesses the basic skills necessary for performance of the job." However, "in a discharge case the requirement that the plaintiff be qualified for the job in question requires some allegation demonstrating satisfactory performance at the time of the discharge." *Dugan v. Martin Marietta Aerospace*, 760 F.2d 397, 400 (2d Cir.1985).

The Court finds that the plaintiff has established, by a preponderance of the evidence, that he was qualified for a cook position at TGI Friday's in September 1989. First, the plaintiff was an experienced baker prep and fry cook for TGI Friday's, having previously worked at the position for more than two years at other TGI Friday's restaurants. Second, he was hired by the Huntington restaurant with the presumed knowledge of his prior work experience at TGI Friday's restaurants. Certainly his prior work experience could have been ascertained, prior to employing him. TGI Friday's knew or should have known of his prior work record and ability and they hired him. Third, he was given overtime work at the Huntington restaurant. This is circumstantial evidence that he was doing his job at least adequately. Fourth, on August 21, 1989, the plaintiff was awarded "Friday's Fry Certification" and "Friday's Baker Prep Certification" (Plaintiff's Exhs. 5 and 6). These certifications, signed by Kitchen Manager Terry O'Deens, included favorable ratings in receipt execution, procedures, correct use of equipment, teamwork, speed and efficiency and personal appearance. Azar's history of certification at

both cooking positions and his being granted overtime work and payment is evidence that his supervisors felt that he was qualified for his cook positions. Finally, the Court notes that, during his tour with the Huntington restaurant, there was only one "Notice of Incident" filed against him with regard to his performance. As stated above, this report was dated August 24, 1989, but was not signed by General Manager Kasper until September 17, 1989, six days after the plaintiff's termination. In this regard, the Court further notes that Juanita Nanez, the defendant's Director of Employee Relations, testified that "in practice and in training we tell our managers that they (the "Notice of Incident" reports) should be completed as soon as possible after the incident." (Tr. at 265). The Court finds that this "Notation of Incident" was another attempt on the part of the defendant to advance a legitimate non-discriminatory reason for the plaintiff's discharge.

As to the fourth and final element that the plaintiff must prove to make out a *prima facie* case of intentional discrimination, the Court finds that the plaintiff did establish that his termination occurred in circumstances giving rise to an inference that it was based on the plaintiff's Iranian national origin. In this regard the Court makes the following findings:

1. In a derogatory and demeaning fashion, Assistant Manager Lance Wolff persistently called the plaintiff "Ayatollah" accompanied by obscenities and words of derision;

2. The plaintiff did not himself initiate the use of the word "Ayatollah" to describe himself;

3. The derisive use of the term "Ayatollah" first used by Wolff was picked up by other employees in an attempt, alternatively to poke fun at, ridicule and express anger to the plaintiff;

4. This use of the word "Ayatollah" to describe the plaintiff in a derogatory manner came to the attention of General Manager Kasper, who, at first ignored it, and then considered the discord this situation was causing in the kitchen.

Accordingly, the Court finds that the plaintiff has established, by a preponderance of the evidence, that his termination on September 11, 1989, occurred in circumstances giving rise to an inference that it was based on the plaintiff's Iranian national origin.

The Court will now review the second tier of the *McDonnell Douglas* analysis; namely, the legitimate non-discriminatory reasons advanced by the defendant. This analysis becomes relatively simple in view of the findings already made by the Court. The two reasons advanced by the defendant are (1) the poor performance by the plaintiff as a cook, and (2) his tardiness. As already discussed, there is little evidence supporting either of these reasons. As to his performance, the Court has already determined that the "poor work output" Notice of Incident was prepared after the plaintiff's termination and done to legitimize the discharge. As for the alleged tardiness, the Court has already reviewed the obvious hindsight post-termination allegation as to lateness. Kasper wrote in all these so-called late incidents well after the plaintiff's discharge. Two of these alleged incidents were for 2 hours and 45 minutes and 3 hours and 12 minutes, yet no incident report was prepared. Four of the alleged incidents were for 2 minutes, 3 minutes, 3 minutes, and 4 minutes. Without adequate records, the Court wonders how the precise minutes of these late incidents could be recorded, well after the events and the discharge.

The Court finds that the two reasons advanced by the defendant for the plaintiff's termination were not the true reasons. Further, the Court finds that the real reason for the plaintiff's termination was his Iranian national origin. Accordingly, the plaintiff has established intentional national origin employment discrimination liability under the *McDonnell Douglas* theory.

### III. *The "Mixed–Motive" Analysis*

Based on the analysis already set forth, the Court finds that the plaintiff established enough evidence that, if believed, could reasonably allow a finder of fact to conclude that the plaintiff was discharged because of his Iranian national origin. In this case, the

Court finds that there was direct evidence of discriminatory animus strong enough to support a "mixed motive" theory. The direct evidence comprising demeaning national origin slurs constitutes "evidence of conduct or statements by persons involved in the decision-making process that may be viewed as directly reflecting the alleged discriminatory attitude ... sufficient to permit the factfinder to infer that the attitude was more likely than not a motivating factor in the employer's decision." *Ostrowski v. Atlantic Mutual Insurance Co., supra,* at 182.

This evidence is tied directly to a discriminatory animus, (*Ostrowski, supra,* at 182), and does not constitute a "stray remark" in the workplace by a person not involved in the relevant decision-making process. Here, this course of conduct and the revealing discriminatory remarks were made by a superior of the plaintiff, Lance Wolff, an Assistant Manager. Although Assistant Manager Wolff was not the ultimate decision-maker, he conferred with General Manager Kasper on a regular basis as to the employees' performance, and, with reasonable certainty he advised the General Manager about employee matters such as those involving the plaintiff. In addition, he was present at the time of the plaintiff's termination. Also, the Court finds that Kasper had actual knowledge of the derogatory use of the term "Ayatollah" and was aware of the disruptive nature of this situation in the restaurant, leading to his decision to terminate the plaintiff.

As stated in *Kotcher v. Rosa & Sullivan Appliance Center, Inc.,* 957 F.2d 59, 64 (2d Cir.1992), "at some point ... the actions of a supervisor at a sufficiently high level in the hierarchy would necessarily be imputed to the company." Thus, the plaintiff is entitled to the burden shifting benefit of the Price Waterhouse mixed motive standard. As the Second Circuit Stated in *Ostrowski:*

> [I]f the plaintiff presents evidence of conduct or statements by persons involved in the decision-making process that may be viewed as directly reflecting the alleged discriminatory attitude, *and that evidence is sufficient to permit the factfinder to infer that that attitude was more likely than not a motivating factor in the employer's decision,* the jury should be instructed that if it does draw that inference the plaintiff is entitled to recover unless the employer has established by a preponderance of the evidence that the employer would have taken the same action without consideration of the impermissible factor.

*Ostrowski v. Atlantic Mut. Ins. Cos.,* 968 F.2d 171, 182 (2d Cir.1992) (emphasis added).

Further, the Court finds, for the reasons already stated, that the defendant failed to prove that it would have discharged the plaintiff even in the absence of the national origin discrimination. There is strong evidence in this case that the use of the term "Ayatollah" accompanied by obscenities and derogatory terms, in a hazing manner, was a competent producing cause of disturbance in the kitchen, violations of the TGI Friday's "open door" policy and "credo" and directly led to the plaintiff's discharge. All of this was caused by the pattern of ridicule, led by Assistant Manager Wolff and joined in by many other employees. TGI Friday's wanted to rid itself of a discordant factor in the kitchen, a factor it precipitated, at the plaintiff's expense.

**IV.** *Damages*

Pursuant to the provisions of Title VII, a Court may award back pay as damages for an unlawful termination. 42 U.S.C. §§ 2000e—2000e–17. In *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 418–419, 95 S.Ct. 2362, 2372, 45 L.Ed.2d 280 (1975) the rule was stated that "[W]here a legal injury is of an economic character, [t]he general rule is, that when a wrong has been done, and the law gives a remedy, the compensation shall be equal to the injury.... The injured party is to be placed, as near as may be, in the situation he [or she] would have occupied if the wrong had not been committed." (internal quotation marks and citation omitted). *Albemarle* aptly illustrates the "make whole" remedy of a back pay award against an employer which has discriminated against an employee.

The parties have submitted damages calculations through April 7, 1996, and the Court will make findings to that date, and also provide for damages to the date of judgment

after consultation with the attorneys for the parties.

Initially, the Court finds that adding overtime to the back wage award would be purely speculative, and no overtime will be included. In addition, the Court adopts the defendant's recommendation that a pay increase to $9.00 as of July 24, 1992, three years after he commenced employment, "would result in a reasonable gradual increase."

In this case, the Court finds that at the time the plaintiff was terminated he received $8.00 per hour. At 40 hours per week, without considering overtime, the plaintiff would have earned $320.00 per week. For 52 weeks, including vacation time, the plaintiff would have earned $16,640 per year. Assuming, with reasonable certainty, that the plaintiff would have received a pay increase at least by July 24, 1992, to $9.00 per hour, and further assuming no overtime, the Court finds that plaintiff's lost wages from July 24, 1992 would be $18,720 per year.

Using these figures, the Court finds that the plaintiff's back wages from September 11, 1989 to April 7, 1996, are the following:

| | |
|---|---|
| September 11, 1989 to September 11, 1990 | $ 16,640 |
| September 11, 1990 to September 11, 1991 | 16,640 |
| September 11, 1991 to July 24, 1992 | 14,080 |
| July 24, 1992 to September 11, 1993 | 21,600 |
| (at $9.00 per hour or $360 per week) | |
| September 11, 1993 to September 11, 1994 | 18,720 |
| September 11, 1994 to September 11, 1995 | 18,720 |
| September 11, 1995 to April 7, 1996 | 11,520 |
| Total Back Wages to April 7, 1996 | $117,920 |

In addition, the plaintiff would have received medical insurance benefits for six years and seven months, or the total sum of $6,879. So that the total back pay award, prior to deductions is $117,920 plus $6,879 or the sum of $124,799 to April 7, 1996.

The parties have stipulated that the plaintiff has received the following monies from September 11, 1989 through April 7, 1996:

| | |
|---|---|
| Interim earnings | $78,765.74 |
| Unemployment insurance benefits | $13,404.00 |
| Public assistance benefits | $12,930.00 |

The parties dispute whether the unemployment insurance and public assistance benefits should be deducted from the back pay award. The defendant contends that "the damage award should consist of wages and benefits minus interim earnings, unemployment and welfare benefits from the date of termination to the date of judgment." (Defendant's Response to Plaintiff's Damages Calculations p. 6). The plaintiff contends that the benefits received from a collateral or third party source such as unemployment insurance and public assistance benefits should not be deducted from the back pay award.

The Second Circuit has not yet decided whether unemployment insurance benefits should be deducted from the back pay recovery. In *Promisel v. First Am. Artificial Flowers, Inc.*, 943 F.2d 251 (2d Cir.1991), *cert. denied*, 502 U.S. 1060, 112 S.Ct. 939, 117 L.Ed.2d 110 (1992), while holding that the issue was waived by the defendant, the Second Circuit stated: "Whether unemployment compensation and social security benefits should automatically be deducted from an award of lost wages has not been answered by this circuit." *Id.* at 258. The court also noted:

> While collateral source payments do represent an additional benefit to the plaintiff, we note a sister circuit's view that "[a]s between the employer, and the employee, who may have experienced other noncompensable losses, it is fitting that the burden be placed on the employer."

*Id.* (citing *Maxfield v. Sinclair Int'l,* 766 F.2d 788, 795 (3d Cir.1985), *cert. denied,* 474 U.S. 1057, 106 S.Ct. 796, 88 L.Ed.2d 773 (1986)).

In *Gaworski v. ITT Commercial Fin. Corp.,* 17 F.3d 1104 (8th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 355, 130 L.Ed.2d 310 (1994), an Age Discrimination in Employment Act case, the Eighth Circuit stated:

> [R]educing a backpay award by unemployment benefits paid to the employee, not by the employer, but by a state agency, makes it less costly for the employer to wrongfully terminate a protected employee and thus dilutes the prophylactic purposes of a backpay award. Indeed, it leads to a windfall to the employer who committed the illegal discrimination. By virtue of state aid provided "to carry out a policy of social betterment for the benefit of the entire state," and not "to discharge any liability or obligation" of the employer, the employer winds up paying less to the em-

ployee than it would have had it not illegally terminated him.

*Id.* at 1113 (citations omitted).

The rationale of the cases providing for such a setoff is based on the premise that the benefit was directly funded by the employer. For example, in *Williams v. Secretary of the Navy,* 853 F.Supp. 66 (E.D.N.Y.1994) the Court deducted unemployment compensation from the plaintiff's back pay award. *Id.* at 72. However, the court noted that "[m]ost other circuits have held that unemployment insurance should not be deducted from back pay awards" on the rationale that funds obtained from a source unconnected with the culpable party should not be used to reduce that party's liability. *Id.* In *Williams,* the defendant had, in effect, paid for the plaintiff's unemployment compensation, making such rationale inapplicable to that case. *Id.*

The trend in the majority of other courts is not to deduct such payments. *See Gaworski,* 17 F.3d at 1113; *Dailey v. Generale,* 889 F.Supp. 108 (S.D.N.Y.1995); *Talada v. International Service System, Inc.,* 899 F.Supp. 936 (N.D.N.Y.1995); *Meschino v. International Tel. & Tel. Corp.,* 661 F.Supp. 254, 261 (S.D.N.Y.1987).

 In this case, there is no evidence that the employer funded either of these benefits and the unemployment insurance and public assistance benefits received by the plaintiff will not be deducted from the plaintiff's back pay award.

In addition, the Court awards prejudgment interest on the plaintiff's net back pay award. In *Loeffler v. Frank,* 486 U.S. 549, 108 S.Ct. 1965, 100 L.Ed.2d 549 (1988), the Supreme Court noted that in Title VII suits, prejudgment interest on back pay awards "of course, is an 'element of complete compensation.'" In *Clarke v. Frank,* 960 F.2d 1146 (2d Cir.1992), the Second Circuit affirmed the district court's award of prejudgment interest under Title VII on the plaintiff's back pay award. The court explained: "Prejudgment interest discourages an employer from attempting to 'enjoy an interest-free loan for as long as [it can] delay paying out back wages.' ... Thus, we have held that 'it is ordinarily an abuse of discre-

tion *not* to include pre-judgment interest in a back-pay award....'" *Id.* at 1153–54 (citations omitted) (emphasis in original).

## IV. *Conclusion*

The plaintiff Farhood Azar is entitled to judgment against the defendant TGI Friday's, Inc. for violating the provisions of Title VII. The award is for back pay and medical insurance benefits lost in the sum of $124,799, less the plaintiff's interim earnings in the sum of $78,765.74, being the net sum of $46,033.26, plus prejudgment interest from September 11, 1989.

In order for the Court to update the damages award and to schedule a motion for attorney's fees and expenses, a status conference will be held on November 22, 1996 at 9:00 a.m. The attorneys and parties are directed to be present at this status conference.

**SO ORDERED.**